[No. B185841. Second Dist., Div. Eight. July 28, 2006.]

CARRIE BURKLE, Plaintiff and Appellant, v.
RONALD BURKLE, Defendant and Respondent.

**COUNSEL**

Michael A. Chodos for Plaintiff and Appellant.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Nabil L. Abu-Assal and Bryan M. Sullivan for Defendant and Respondent.

**OPINION**

**BOLAND, J.—**

## SUMMARY

A daughter brought a lawsuit against her father, seeking declaratory relief and an accounting with respect to an investment the father made for the daughter without her knowledge. The daughter asserted the father improperly repaid himself, from her capital account in the limited liability company in which the funds were invested, for the funds he advanced. We hold that:

(1) The trial court erroneously granted summary judgment to the father, because triable issues of fact exist as to whether the funds advanced were a loan (as the father contends) or a gift (as the daughter contends).

(2) The daughter was entitled to discovery of the financial records of the limited liability company in which she held a 1 percent interest, based upon the inspection rights provided under Corporations Code section 17453 to members of foreign limited liability companies residing in California. The trial court therefore erred in denying the daughter's motion to compel production of company records.

(3) The trial court abused its discretion in failing to permit the daughter to amend her complaint to seek damages from the father for conversion and breach of fiduciary duty.

## FACTUAL AND PROCEDURAL BACKGROUND

Carrie Burkle is Ronald Burkle's adult daughter.[1] In 1995, when Carrie was 19, her father formed Yucaipa Monterey, LLC, a Delaware limited liability company that was formed to purchase art and owns an unspecified number of paintings. Carrie has had a 1 percent interest in Yucaipa Monterey

---

[1] To avoid confusion, we use the given names of the parties rather than their surnames.

since its formation. Carrie's father owns 99 percent of the company, and provided the funds for Carrie's 1 percent interest.

In November 2003, several months after her mother, Janet Burkle, filed a petition for dissolution of her marriage to Carrie's father, Carrie filed a lawsuit naming her father and her mother as defendants. Carrie's mother is paying Carrie's legal fees for the lawsuit. The lawsuit alleged that Carrie's parents made various investments for her benefit, during her minority and thereafter, and asserted numerous causes of action for breach of fiduciary duty and constructive fraud, fraudulent suppression of fact, unjust enrichment and constructive trust, declaratory relief, an accounting, and for the return of personal property. Among the investments identified was Ronald's acquisition for Carrie of her 1 percent interest in Yucaipa Monterey. As to the Yucaipa Monterey investment, Carrie alleged causes of action for declaratory relief and an accounting.[2] Specifically, Carrie's first amended complaint alleged that she learned of her 1 percent ownership interest on approximately September 23, 2003, and that her father claimed she owed him $14,783 allegedly lent to her to acquire her 1 percent interest. Carrie asserted the value of Yucaipa Monterey was $8.5 million, and sought declaratory relief, requesting the court to "determine the rights and obligations of the parties arising from [Carrie's] claims regarding her interest in [Yucaipa Monterey] and Ronald's claims that [Carrie] owes him money," and to "determine the value of [Carrie's] 1% interest . . . and that her interest be liquidated and the funds paid to [Carrie]." She also asserted she was entitled to an accounting, "[b]ased on the fiduciary relationship between [Carrie] and [her parents]," of "all monies due her . . . ."

Carrie filed discovery requests, among which was a request for documents relating to the financial condition and assets of Yucaipa Monterey. Ronald resisted, and on November 18, 2004, the trial court denied Carrie's motion to compel production of the Yucaipa Monterey financial records, without prejudice. The court stated that "[i]f the answer is not received at the deposition [of Ronald Burkle], then the motion may be renewed . . . ." After Ronald's deposition on January 11, 2005, Carrie renewed her motion to compel production of Yucaipa Monterey documents, because Ronald refused to provide information about the company's assets at his deposition.[3] Carrie argued Ronald, by virtue of his control over her interest in Yucaipa Monterey,

---

[2] On June 23, 2005, Carrie voluntarily dismissed without prejudice the eight other causes of action, which involved claims related to other investments her parents made on her behalf and her claim for the return of personal property.

[3] Carrie's original document requests included (1) all financial statements, books of account, bank statements and tax returns; and (2) all documents evidencing the assets owned by Yucaipa Monterey and the value of those assets. Ronald made numerous objections, but stated he would "produce non-privileged documents that are in his possession, custody and control . . . ." In her motion to compel, Carrie complained that Ronald produced some tax documents, but redacted

had a fiduciary duty to disclose the information, and also had a statutory obligation under the Corporations Code to provide access to Yucaipa Monterey's books and records. She asserted the discovery was relevant and necessary "to determine the value of Carrie's interests in Yucaipa Monterey and for calculation of damages."

The trial court requested further briefing to identify the statutory or common law sources creating a right to discovery of the financial records of a limited liability company in which Carrie has a 1 percent interest and her father has a 99 percent interest, including whether Delaware or California law applied to the asserted statutory obligation to provide access. The court ultimately denied Carrie's motion, concluding Carrie had no right to discovery of the requested information. The court concluded a right to discovery exists where the plaintiff alleges wrongdoing by a defendant and seeks to discover evidence to support the claim, or where applicable corporations statutes create a disclosure obligation. However:

—Because Carrie did not allege any wrongdoing by Ronald, the scope of Carrie's discovery rights was defined by the statutes creating disclosure obligations on the part of the managers of limited liability companies;

—If California law applied, Carrie was not entitled to discovery because she does not own the threshold 25 percent interest necessary to entitle her to discovery of the company's financial records; and

—If Delaware law applied, the Delaware chancery court has exclusive jurisdiction to decide whether Carrie was entitled to the discovery she sought.

Meanwhile, Ronald filed a motion for summary judgment or summary adjudication. Ronald asserted, among other points, that:

—Carrie admitted at her deposition that she had no evidence of any improprieties by Ronald in connection with the investments at issue.

---

the name of the tax preparers and unilaterally blacked out information from other documents, including names of other investors and names and/or descriptions of the artwork owned by Yucaipa Monterey. Carrie asserted Ronald's redactions prevented her from ascertaining the value of her interest in the company and thwarted further discovery. In addition, at his deposition, Ronald refused to respond to questions asking him to identify and give the location of the various pieces of art that make up the assets of Yucaipa Monterey, and to answer questions "relating to where Yucaipa Monterey . . . derives its income . . . ." Carrie sought to compel Ronald's answers to those and other questions relating to the identity, location and value of Yucaipa Monterey's assets.

—Carrie admitted the purpose of her lawsuit was to obtain an accounting of all the accounts and interests her father set up for her.

—All of the money in the accounts and interests at issue came from Carrie's father, "without any obligation on his part to do so."

—Carrie owns a 1 percent interest in Yucaipa Monterey.

—In 1995 and 1996, Ronald made capital contributions to Yucaipa Monterey on Carrie's behalf in the form of a loan in the amount of $85,774. In 2003, Ronald drew down Carrie's capital account in Yucaipa Monterey to repay himself for his prior loans to Carrie "by which he funded her capital account, plus interest that had accrued on those loans since 1995 and 1996." Ronald's repayment to himself totaled $107,017.

Carrie opposed Ronald's motion for summary judgment. She disputed Ronald's testimony that his capital contributions on her behalf were loans, asserting that no loan agreements were ever made between her and her father, and that her father "never told [her] he thought these investments were 'loans' from him instead of gifts from him to [her], and never told [her she] would have to repay him for these investments, either principal or interest." She also disputed Ronald's claim that she had no evidence of any improprieties, asserting that she "never authorized her father to make any loans on her behalf; she never agreed to any loan; [she] testified at her deposition that she did not have enough information to determine whether any improprieties occurred"; and she "also testified that she did not know what her father did with the money" in her accounts and investments.[4]

Two days before the hearing on Ronald's summary judgment motion, Carrie filed a motion for leave to file a second amended complaint. Carrie sought to add causes of action for conversion and breach of fiduciary duty based upon Ronald's "unilateral appropriation of $107,017 of Carrie's funds from Yucaipa Monterey . . . as alleged 'repayment' of a claimed 'loan' he made to her for her capital contribution in that entity."

On July 12, 2005, the trial court granted summary adjudication of Carrie's causes of action for declaratory relief and an accounting with respect to Yucaipa Monterey. The court observed:

—Carrie's testimony did not create a triable issue of fact that Ronald had any obligation to render an accounting to her or that he breached any duty

---

[4] Carrie also argued Ronald's motion for summary adjudication was procedurally defective, and she renews the argument on appeal. Because we conclude Ronald was not entitled to summary judgment, we need not consider this contention.

owed to her or committed any wrongful act. "To the contrary, [Carrie] has admitted in deposition that she has no evidence or belief that [Ronald] has committed any wrong against her."

—Ronald presented evidence demonstrating "he gave her a 1% interest which was funded by proceeds that he loaned to her and caused Yucaipa Monterey LLC to repay to him. [Carrie's] evidence does not demonstrate there is a triable issue of fact as to any actual, present controversy over her 1% interest in Yucaipa Monterey . . . ."

—Carrie's evidence that Ronald "never told her about the loan and only spoke to her generally about gifts does not create a triable issue that the money he withdrew from Yucaipa Monterey LLC was not a loan but something the court should declare to be otherwise."

As for Carrie's motion for leave to file a second amended complaint, the court observed Carrie did not seek a ruling on her motion before the hearing on the summary judgment motion, and did not submit any evidence in opposition to the summary judgment motion that would tend to show a triable issue of fact as to whether Ronald converted or misappropriated her property or breached any fiduciary duty owed to her.

Judgment was entered in favor of Ronald on August 15, 2005, and this appeal followed.

## DISCUSSION

Carrie contends summary judgment should have been denied; she was entitled to discovery and all inspection rights she would have if Yucaipa Monterey were a California entity; and it was error to deny her motion for leave to file a second amended complaint. We agree on all counts.

We review first the principles governing summary judgment, and then turn to the substance of each of the trial court's rulings.

### 1. *The standard of review.*

We reiterate the established principles governing summary judgment. The trial court's ruling is reviewed de novo to determine whether the moving party, Ronald, has established there is no triable issue as to any material fact and he is entitled to judgment as a matter of law. Ronald must show either (1) that Carrie cannot establish one or more elements of her causes of action

for declaratory relief and an accounting, or (2) that there is a complete defense. If that burden of production is met, the burden shifts to Carrie to show the existence of a triable issue of fact with respect to the cause of action or defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493]; Code Civ. Proc., § 437c, subds. (c), (o) & (p).)

### 2. *Ronald was not entitled to summary judgment.*

The question on appeal is whether a triable issue of fact exists as to Carrie's claim that Ronald misappropriated her investment in Yucaipa Monterey by taking $107,017 from her capital account. This question turns on whether the funds invested for Carrie were a gift or a loan.

Ronald contends the undisputed facts—consisting of his own declaration that he intended a loan, not a gift—show he lent Carrie the funds for her capital contribution to the company and was entitled to repayment of the loan with interest. According to Ronald, Carrie failed to present sufficient evidence demonstrating a triable issue of fact that the monies he advanced were a gift. Carrie contends otherwise, asserting that Ronald did not establish his right to appropriate the funds in her capital account as a matter of law, and poses the factual dispute this way: "Carrie's Declaration created an evident factual dispute which went to the heart of Ronald's motion for summary judgment: He claimed the existence of a loan agreement in 1995; she denied the existence of any such agreement and denied that the subject ever even came up or was discussed."

■ We agree with Carrie. The question whether a transfer of funds was a gift or a loan often presents questions of fact, and this case is no different. The question depends principally upon Ronald's intent at the time he advanced the funds to acquire Carrie's 1 percent interest.[5] Ronald's declaration states his advance was made in the form of a loan. But sufficient evidence was presented to permit a reasonable fact finder to conclude otherwise:

—First, as Carrie avers, Ronald at no time raised or discussed the subject of a loan with her and, in her younger years, often spoke to her of investments he had "given" her and her siblings.

---

[5] The elements of a gift are: "(1) competency of the donor to contract; (2) a voluntary intent on the part of the donor to make a gift; (3) delivery, either actual or symbolical; (4) acceptance, actual or imputed; (5) complete divestment of all control by the donor; and (6) lack of consideration for the gift." (*Jaffe v. Carroll* (1973) 35 Cal.App.3d 53, 59 [110 Cal.Rptr. 435].)

—Second, Ronald presented no evidence of the terms upon which he lent Carrie the money to purchase her 1 percent interest in Yucaipa Monterey. Until he distributed Carrie's capital account to Carrie on the books of the company—and to himself in actuality—no record anywhere reflected a loan to Carrie: no indication of the principal amount of the loan; no indication of the interest rate to be charged; and no indication when the loan would be due and payable. While the absence of documentation might be understandable when a parent is investing for a minor child, Carrie was an adult when Ronald made this investment on her behalf. In a transaction involving adults, it is not unreasonable to infer that if Ronald intended to create a repayment obligation on Carrie's part, some evidence of that obligation and its terms would exist.

—Third, Ronald's declaration asserts that Carrie currently owes him—that is, even after Ronald repaid himself with substantially all of Carrie's capital account—"$14,783.00 of additional interest that had accrued beyond the capital account balance." The record, however, is devoid not only of any evidence of the terms of the asserted loan but also of any evidence Carrie agreed to those terms, which are known to no one but Ronald. While we can conceive of circumstances under which a parent might make an investment for a minor child with the expectation of recouping the monies advanced from the fruits of the investment, we do not see how a parent can unilaterally determine the terms of a loan to an adult child, and assert his entitlement to unpaid interest, without the knowledge or agreement of the borrower.

In short, on this record we cannot say that Ronald has met his burden of establishing no triable issue of fact exists as to whether his advance of funds was a gift or a loan. A fact finder could reasonably infer—from the absence of any evidence of the terms of a loan, from Ronald's failure to tell Carrie he was lending her funds she would be obligated to repay with interest, and from the lack of any agreement to loan terms—that Ronald intended a gift at the time he made the investment for Carrie. (Cf. *Eklund v. Eklund* (1946) 76 Cal.App.2d 389, 392 [173 P.2d 50] ["trial court had the right to consider that where services are rendered by a near relative or member of a family without an agreement thereon an inference that payment or compensation is to be made is not usually drawn"].) The only evidence of a loan is Ronald's declaration that he made the capital contributions for Carrie "in the form of a loan . . . ." A trier of fact, however, might disbelieve Ronald's testimony. (See Code Civ. Proc., § 437c, subd. (e) [summary judgment may be denied in the discretion of the court "where a material fact is an individual's state of mind,

or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof"].)[6]

In sum, the evidence presented in the summary judgment proceeding does not compel the conclusion that Ronald lent, rather than gave, Carrie the funds for her 1 percent investment in Yucaipa Monterey. That question is for the trier of fact, and the trial court therefore erred in granting summary judgment to Ronald.[7]

### 3. *The trial court erred in refusing to compel production of Yucaipa Monterey's financial records.*

Carrie contends the trial court erred in declining to compel Ronald to produce documents and answer questions about the assets of Yucaipa Monterey. She argues she was entitled to access to Yucaipa Monterey's financial records (a) because she is an owner of Yucaipa Monterey, and (b) under California's liberal discovery statutes, "in support of her causes of action for declaratory relief and accounting." We agree Carrie is entitled to discovery as an owner of Yucaipa Monterey.

Carrie's motion to compel further discovery responses was not premised upon any allegations of misappropriation or other wrongdoing by Ronald with respect to Yucaipa Monterey, but instead was based only on her declaratory relief and accounting claims and upon her common law and statutory rights as an owner of the company. Because Carrie expressly admitted she was alleging no wrongdoing, the trial court was correct in (a) declining to compel discovery on the basis of case precedents addressing the duty of business partners or corporate directors to disclose financial

---

[6] Ronald also suggests Carrie cannot establish the funds were a gift because a transfer of money does not constitute a gift unless the donor relinquishes control over the money. Ronald is correct that the elements of a gift include complete divestment of all control by the donor. (*Jaffe v. Carroll, supra,* 35 Cal.App.3d at p. 59.) This does not help Ronald, however, because he necessarily relinquished control over the funds he advanced when he invested them in Yucaipa Monterey in return for Carrie's—not Ronald's—1 percent interest in the company. (See *Jaffe v. Carroll, supra,* 35 Cal.App.3d at p. 60 [where donor's control over a gift " 'does not vest in the donor any interest or title in the property itself, and . . . is to be exercised by the donor as agent of the donee,' " the gift is not affected or invalidated, quoting *Connelly v. Bank of America* (1956) 138 Cal.App.2d 303, 307 [291 P.2d 501]].) Ronald has no title to or interest in Carrie's investment in Yucaipa Monterey. Any control Ronald has flows from his position as manager of the company, not from his position as provider of the funds.

[7] Ronald urges us to affirm the trial court's summary judgment order based on the statute of limitations, an issue not mentioned in the trial court's order. We decline to do so. Since Ronald did not take the funds in Carrie's capital account until 2003 and Carrie did not learn he had done so until 2004, Ronald's convoluted argument that the statute of limitations bars both Carrie's original and proposed claims is not meritorious.

records to partners or shareholders where wrongdoing is alleged, and (b) concluding the scope of Carrie's discovery rights was defined by California statutes creating disclosure obligations on the part of managers of limited liability companies. However, the trial court erred when it construed the relevant statute as requiring Carrie to own a 25 percent interest in Yucaipa Monterey in order to be entitled to disclosure of the company's financial records.

Because Yucaipa Monterey is a Delaware limited liability company, not a California company, inspection rights are governed by Corporations Code section 17453, which states: "If the members of a foreign limited liability company residing in this state represent 25 percent or more of the voting interests of members of that limited liability company, those members shall be entitled to all information and inspection rights provided in Section 17106."[8] (Corp. Code, § 17453.) Carrie contends she is entitled to inspection rights under Corporations Code section 17106 because all the members of Yucaipa Monterey—she with a 1 percent interest and her father with a 99 percent interest—reside in California. We agree.

We need not dwell at length on the well-established principles of statutory interpretation. The court is required to ascertain the intent of the Legislature so as to effectuate the purpose of the law, looking first to the words of the statute and giving them their usual and ordinary meaning. The meaning of a statute is not determined from a single word or sentence. Instead, words and sentences are construed in context and in the light of the statutory scheme. (*Department of Industrial Relations v. Lee* (1999) 73 Cal.App.4th 763, 766–767 [86 Cal.Rptr.2d 710].) If no definitive answer flows from the terms of the statute, the court looks to extrinsic aids, such as the object to be achieved, legislative history and public policy. (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970].)

In this case, we see no occasion to look beyond the words of the statute in their usual and ordinary meaning to determine the Legislature's intent. Corporations Code section 17453 states simply that, if members

---

[8] Under Corporations Code section 17106, subdivision (a), a member or holder of an economic interest in a California limited liability company, "for purposes reasonably related to the interest of that person as a member or a holder of an economic interest," is entitled to access to records the company is required to maintain under Corporations Code section 17058. This includes financial statements; federal, state and local income tax or information returns and reports; a current list of members or holders and their contributions and shares; the articles of organization; the company's operating agreement; and books and records as they relate to the company's internal affairs. (Corp. Code, § 17058, subd. (a).)

residing in California represent 25 percent or more of the voting interests of the company, as they clearly do here, those members are entitled to inspection rights provided by California law. In our view, "those members" unambiguously refers to California members, and merely distinguishes members residing in California from members residing elsewhere, who are not entitled to inspection rights under California law.

Ronald contends Carrie's construction of the statute—and ours—is mistaken, and "those members" entitled to inspection rights are only those California members with a 25 percent or greater interest. His sole argument is that the interpretation of Corporations Code section 17453 "boils down to the California Legislature's use of the word 'those' in stating 'those members shall be entitled to all information and inspection rights . . . .' " According to Ronald, the Legislature's use of the word "those" shows that "the Legislature intended that only 'those' members owning more than an aggregate of 25% of the entity and residing in California be allowed inspection rights under" Corporations Code section 17106. Any other interpretation, Ronald claims, "would negate the Legislature's use of the word 'those' and be an improper interpretation of the statute." For this proposition, Ronald cites cases stating significance should be given to every word of a statute, and rejecting interpretations that would render particular terms mere surplusage.

We cannot agree with Ronald's strained interpretation of the word "those," or with his assertion that our construction of the statute renders the word "mere surplusage." We certainly agree that "those members" in the second clause of the sentence applies to the same members described in the first clause. That is, the phrase "those members" necessarily refers to members residing in California, in cases where members residing in California represent 25 percent or more of the voting interests of the company. However, no rule of construction or grammar requires or implies anything more. We cannot add to the statutory language, and neither the words of Corporations Code section 17453 nor the statute as a whole suggests any basis for implying a requirement that only members with a 25 percent interest are entitled to inspection rights. The word "those" does not become "mere surplusage," nor does it lose any significance under our interpretation of the statute. On the contrary, it retains its ordinary and usual meaning.

Furthermore, Ronald's construction of the statute would have entirely anomalous results. Suppose, for example, a Delaware limited liability company is owned by four members, all residing in California, two with interests of 26 percent each, and two with interests of 24 percent each. Why should a

24 percent shareholder be deprived of inspection rights that a 26 percent shareholder could exercise? We cannot think the Legislature intended to discriminate among California members in this way. On the contrary, the only equitable construction of the statute is that, once the interest of California residents in a company reaches 25 percent, any California member is entitled to the benefits of California law on inspection of the company's records.

Our interpretation rests on legislative intent discerned from the words of the statute. Even if the statutory language could be construed as ambiguous, however, our construction of the statute would remain the same. First, we have been presented with and are aware of no legislative history pertinent to Corporations Code section 17453, and are reluctant to imply a limitation on the corporate rights provided to California residents without some indication from the statutory scheme that the Legislature intended the limitation. No such indication is evident. Second, in the case of limited liability companies formed in California, the Legislature has provided for access to records for any member holding an economic interest, with no limitation on the amount of the interest. (Corp. Code, § 17106, subds. (a) & (b).) These provisions giving access to all members of California limited liability companies, regardless of the size of their interests, suggest a statutory scheme in which the Legislature did not intend to restrict the similar inspection rights of any California members of foreign limited liability companies, once the 25 percent threshold of California ownership is met. Third, when the Legislature desires to limit access to corporate documents to members whose interests aggregate a certain amount, it has done so expressly. (See Corp. Code, § 17106, subd. (c)(2) [quarterly income statements must be provided upon written request of "[m]embers representing at least 5 percent of the voting interests of members, or three or more members"].) In short, Ronald offers and we find no basis in legislative history, statutory objectives, policy or practicality to support an intention by the Legislature to restrict the inspection rights of California members of foreign limited liability companies to those California members holding a 25 percent interest.

As applied to this case, the words of the statute say simply that, if the members of Yucaipa Monterey residing in this state represent more than 25 percent of the voting interests of members of the company (and in this case they represent 100 percent), "those members"—in this case, Ronald and Carrie—are entitled to inspection rights. The statute does not allow one California member to veto another's exercise of inspection rights. Accordingly, the trial court erred in concluding Carrie was not entitled to discovery of Yucaipa Monterey's records.

### 4. *The trial court abused its discretion when it denied Carrie leave to amend her complaint to add claims for conversion and breach of fiduciary duty.*

Finally, Carrie contends the trial court abused its discretion in failing to permit her to amend her complaint to seek damages from Ronald for conversion and breach of fiduciary duty. As Carrie observes, the proposed amendment did not seek to introduce new facts or new primary rights, but merely to allege claims at law for damages, "based upon the same dispute . . . about whether Carrie's capital investment in Yucaipa Monterey was a loan or a gift from her father Ronald." The trial court noted, as one basis for denying leave to amend, that Carrie did not submit any evidence in opposition to the summary judgment motion that would tend to show a triable issue of fact as to whether Ronald converted or misappropriated her property or breached any fiduciary duty owed to her. In light of our conclusion a triable issue of fact exists as to whether Ronald gave or lent Carrie the funds for her 1 percent investment in Yucaipa Monterey—and consequently, whether his appropriation of those funds for himself was a conversion—the trial court's rationale for refusing to permit amendment of Carrie's complaint has no legal basis. Given the trial court's legal error, the "strong policy in favor of liberal allowance of amendments" (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 296 [216 Cal.Rptr. 443, 702 P.2d 601]), and the lack of any prejudice to Ronald, Carrie should be granted leave to file an amended complaint.[9]

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court with directions to (1) vacate its order granting Ronald Burkle's motion for summary adjudication and denying Carrie Burkle's motion for leave to file a second amended complaint, and enter a new order denying the motion for

---

[9] Ronald argues the trial court did not abuse its discretion in denying leave to amend Carrie's complaint because the court also based its denial on the ground Carrie did not seek a ruling on her motion to amend before the hearing on the summary judgment motion, relying on *Distefano v. Forester* (2001) 85 Cal.App.4th 1249 [102 Cal.Rptr.2d 813]. In *Distefano*, the court observed that opposition evidence in summary judgment proceedings must be directed to issues raised by the pleadings; if the opposing party's evidence would show a factual assertion or legal theory not yet pleaded, the party should seek leave to amend the pleadings before the hearing on the summary judgment motion. (*Id.* at pp. 1264–1265.) Carrie did so, filing her motion for leave to amend on July 6, 2005, two days before the July 8 hearing on Ronald's summary judgment motion. Moreover, the point of the *Distefano* rule is that opposition evidence must address the factual assertions and legal theories at issue. Carrie's opposition did just that: Ronald sought summary judgment on the basis that his capital contribution to Yucaipa Monterey for Carrie was a loan, and Carrie's opposition asserted it was a gift. The proposed amendments to the complaint are based on the same fact issues, but would allow Carrie to assert claims at law for damages, in addition to declaratory relief and an accounting.

summary adjudication and granting leave to file a second amended complaint; and (2) vacate its order denying Carrie Burkle's motion to compel further responses and production of documents and enter a new order granting the motion. Carrie Burkle is to recover her costs on appeal.

Cooper, P. J., and Rubin, J., concurred.