[No. H035333. Sixth Dist. Oct. 4, 2011.]

MICHAEL KERKELES, Plaintiff and Appellant, v.
CITY OF SAN JOSE et al., Defendants and Respondents.

Corsiglia McMahon & Allard, Timothy D. McMahon, Jeffry W. Lochner; Walkup, Melodia, Kelly & Schoenberger and Matthew D. Davis for Plaintiff and Appellant.

Richard Doyle, City Attorney, Nora Frimann, Assistant City Attorney, and Clifford S. Greenberg, Deputy City Attorney, for Defendants and Respondents.

## OPINION

**ELIA, J.**—Plaintiff Michael Kerkeles appeals from a judgment following the superior court's order granting summary adjudication in favor of the City of San Jose (City) and one of its police officers, Matthew Christian. Plaintiff contends that triable issues of material fact defeat defendants' motion. We agree and accordingly must reverse the judgment.

### *Background*

On March 15, 2005, a woman called the San Jose police to report that her daughter, referred to on appeal as "Jane Doe," had been raped by a neighbor the previous day. During an interview with Officer Matthew Kurrle, Jane answered questions that described the details of a sexual assault by plaintiff. Jane was developmentally delayed, however, so Officer Kurrle was unable to establish a "distinct time line or chain of events." Jane was unwilling to undergo a SART (sexual assault response team) examination that day, but the next day she was cooperative. The examination revealed a small tear in the posterior fourchette of Jane's vagina, as well as general redness in the area.

On March 21, 2005, Jane was interviewed again, this time by defendant Christian. She told him that she was 22 years old, but her mother informed Christian that Jane had the "mentality" of a seven year old. According to Christian's undated supplemental report, Jane said that the assault took place on a pink-and-peach-colored blanket which was located in the garage.

On May 2, 2005, a search warrant was issued for plaintiff's residence, as well as a warrant for his arrest for forcible oral copulation (Pen. Code, § 288a,

subd. (c)). Two days later plaintiff was arrested and Christian served the search warrant, locating 27 pornographic magazines. In his case update, Christian stated that Jane had located the blanket she had described, and that when she saw it, she shrieked and ran away.[1] In addition, Christian prepared a "ruse" crime lab report indicating that plaintiff's semen had been found on the blanket. The actual report generated by the crime lab revealed no semen on the blanket. Only a bloodstain was detected, and that belonged to plaintiff.

The prosecutor successfully sought amendment of the complaint to add a charge of oral copulation involving a victim incapable of giving consent due to a disability, a violation of Penal Code section 288a, subdivision (g). Christian testified at the preliminary hearing on July 19, 2006. Among the facts he related was the false statement in the ruse report that semen had been found on the blanket. The district attorney attempted to question Jane Doe at the hearing, but it was difficult to elicit clear answers from her, and the prosecutor eventually gave up. The court granted a defense motion to strike her testimony. The court found probable cause to hold plaintiff to answer.

Twice in the weeks after the hearing, plaintiff's criminal defense attorney, Kurt Seibert, called the crime lab to discover the reason for the discrepancy between the two lab reports in his possession. He learned that the lab report on which Christian had testified was fabricated, and that the purported analyst, "Rebecca Roberts," did not exist at the lab. At some point Brooke Barloewen (identified by plaintiff as the crime lab supervisor) notified the deputy district attorney on the case, Jaime Stringfield,[2] that the report was a ruse. Stringfield assured Barloewen that "ruses are legal" and that "she had seen them used before."

Stringfield contacted Christian on October 11, 2006, to tell him that she had learned that the report to which he had testified was not real. She conveyed to her supervisor, Victoria Brown, that Christian "did not recall creating the document and felt that maybe someone else had, trying to be helpful, to prepare for an interrogation that did not take place." Brown asked that Christian prepare a supplemental report describing the "chain of events that [had] led to [the] fake report being mistaken for [the] real report."

---

[1] Plaintiff disputed this statement. His wife, Caitlin, testified in her deposition that she told police where to find the blanket.

[2] Stringfield confirmed in her deposition testimony that the information contained in the fabricated lab report was "helpful" to the prosecution and "not so good for [the defense]," to which defense counsel agreed.

In his supplemental report Christian stated that he had forgotten about the existence of the ruse report. He had given it to Stringfield along with the rest of the case file, without realizing that it was not genuine. When he testified, he "believed the report was genuine and the results the report described were accurate." When asked after the truth came to light, he told Stringfield that he had not used a ruse because plaintiff had not waived his *Miranda* rights after his arrest. According to Christian, after he became aware of his mistake he called a sergeant in the sexual assault unit and then called Stringfield.

On November 20, 2006, plaintiff was offered a plea deal to a reduced charge of felony false imprisonment with no jail time. On December 4, 2006, Seibert wrote to Brown and Stringfield stating that he intended to move for dismissal based on perjury by Christian, falsification of the lab report, and *Brady* error.[3] The letter was received the next day, and on December 6, the district attorney dismissed the charges against plaintiff.

Plaintiff initiated this action on January 17, 2008, naming Christian and the City, through its police department. Plaintiff generally alleged that Christian had known that he was testifying based on a fabricated report and therefore committed perjury. In the 10-count complaint, he asserted violation of his civil rights under 42 United States Code section 1983 (hereafter section 1983) and Civil Code section 52.1, abuse of process, malicious prosecution, false imprisonment, intentional and negligent infliction of emotional distress, negligence, and (against the City) negligent hiring, retention, training, supervision, and discipline.

Defendants moved for summary judgment or, alternatively, summary adjudication. The trial court granted summary adjudication of the civil rights claims and those of malicious prosecution and false imprisonment.[4] With respect to the causes of action for negligent infliction of emotional distress, negligence, and negligent hiring and supervision, the motion was treated as a motion for judgment on the pleadings and granted. Only the third and sixth causes of action, for abuse of process and intentional infliction of emotional distress, remained. Plaintiff then dismissed these claims without prejudice, and judgment was entered for defendants.

*Discussion*

■ On appeal, plaintiff challenges the adjudication of the first two causes of action, alleging liability of Christian and the City under section 1983.

---

[3] See *Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194] (failure to disclose exculpatory evidence violates the due process clause).

[4] The superior court made a factual determination that when Christian testified at the preliminary hearing he was unaware that he was basing his testimony on a "fake report he had previously drafted."

Section 1983 "imposes civil liability only upon one 'who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities *secured by the Constitution and laws* . . . .' " (*Baker v. McCollan* (1979) 443 U.S. 137, 140 [61 L.Ed.2d 433, 99 S.Ct. 2689].) Accordingly, "before the relationship between the defendant's state of mind and his liability under § 1983 can be meaningfully explored, it is necessary to isolate the precise constitutional violation with which he is charged." (*Ibid.*)

 Here, plaintiff focuses on substantive due process as the constitutional foundation of his section 1983 claims.[5] An inquiry in this context poses "the threshold question [of] whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." (*County of Sacramento v. Lewis* (1998) 523 U.S. 833, 847, 848, fn. 8 [140 L.Ed.2d 1043, 118 S.Ct. 1708].) The United States Supreme Court has made it "clear that procedural regularity notwithstanding, the Due Process Clause is violated by the knowing use of perjured testimony or the deliberate suppression of evidence favorable to the accused." (*Albright v. Oliver* (1994) 510 U.S. 266, 299 [127 L.Ed.2d 114, 114 S.Ct. 807] (dis. opn. of Stevens, J.).)

### 1. *Standard and Scope of Review*

Code of Civil Procedure section 437c, subdivision (f)(1),[6] allows a party to move for summary adjudication "as to one or more causes of action within an action . . . if that party contends that the cause of action has no merit . . . ." "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment." (§ 437c, subd. (f)(2).) Accordingly, "[a] summary adjudication motion is subject to the same rules and procedures as a summary judgment motion." (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56].)

---

[5] The due process clause of the Fourteenth Amendment states: ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law." "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them . . . [the due process clause] serves to prevent governmental power from being 'used for purposes of oppression.' " (*Daniels v. Williams* (1986) 474 U.S. 327, 331 [88 L.Ed.2d .662, 106 S.Ct. 662]; cf. *Collins v. Harker Heights* (1992) 503 U.S. 115, 127, fn. 10 [117 L.Ed.2d 261, 112 S.Ct. 1061] [due process clause was intended to protect individual from arbitrary exercise of government powers].)

[6] All further references to section 437c are to the Code of Civil Procedure.

"A defendant making the motion for summary adjudication has the initial burden of showing that the cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. [Citations.] If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers establish a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff to make a prima facie showing of the existence of a triable material factual issue." (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81–82 [12 Cal.Rptr.3d 97].) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 851 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We independently review a ruling on a motion for summary judgment or summary adjudication. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660].)

## 2. The Complaint

Because it is the pleadings that circumscribe the issues presented in a summary judgment or summary adjudication proceeding, we first examine the allegations of plaintiff's complaint as they relate to the section 1983 claims. In the first cause of action plaintiff alleged that the deliberate use of the false report in the preliminary hearing deprived him of due process.[7] In the second cause of action plaintiff alleged that these constitutional violations were caused by "customs, policies, directives, practices, acts and omissions of the [City] and its authorized policy makers." Among those customs and policies were "teaching and encouraging SJPD officers to create counterfeit crime lab reports that contain false information, failing to adequately provide SJPD officers with sufficient training regarding the prohibition on fabricating evidence and providing perjured testimony, and failing to adequately provide SJPD officers with sufficient training regarding their obligation to produce exculpatory evidence." In addition, the City did not supervise Christian; alternatively, it "authorized, directed, condoned, and/or ratified" Christian's conduct.

## 3. Defendants' Showing

### a. First Section 1983 Cause of Action

Among the defenses raised in defendants' motion was Christian's entitlement to qualified immunity. Defendants continue to assert this protection from liability on appeal. In undertaking an examination of this issue,

---

[7] He also invoked the Fourth Amendment right to be free from unreasonable searches and seizures, but he has not pursued that avenue on appeal.

courts decide two questions. First, they ask whether the alleged facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. (*Saucier v. Katz* (2001) 533 U.S. 194, 200 [150 L.Ed.2d 272, 121 S.Ct. 2151].) "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." (*Id.* at p. 201.) "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Id.* at p. 202.) Courts are cautioned not to skip the first step: "[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question." (*County of Sacramento v. Lewis, supra*, 523 U.S. 833, 841, fn. 5; see also *Siegert v. Gilley* (1991) 500 U.S. 226, 232 [114 L.Ed.2d 277, 111 S.Ct. 1789] [courts should not assume, without deciding, the preliminary issue of whether the plaintiff has asserted a violation of a constitutional right at all].)

Defendants offer three underlying points in support of the summary adjudication order. In their view, no violation of due process can be shown because (1) the falsified evidence did not lead to a conviction; (2) there was no deprivation of liberty because plaintiff was never incarcerated except briefly after his arrest; and (3) the mere fact that he was held to answer after the preliminary hearing "does not establish that the testimony about the ruse report *caused* his continued prosecution, in that probable cause existed independently of that testimony." In addition, defendants rely on *Devereaux v. Abbey* (9th Cir. 2001) 263 F.3d 1070 (*Devereaux*) to argue that plaintiff's section 1983 claims fail for lack of proof that Christian knew or should have known that he was innocent.

■ The premise of the first point is faulty. There is no authority for defendants' argument that a due process claim cannot be established unless the false evidence is used to *convict* the plaintiff. *Gregory v. City of Louisville* (6th Cir. 2006) 444 F.3d 725 does not so hold, nor does *Castellano v. Fragozo* (5th Cir. 2003) 352 F.3d 939. The fact that the plaintiffs in these cases

brought suit after being convicted based on fabricated evidence does not denominate conviction as a prerequisite to a successful complaint. Even in *Devereaux*, defendants' primary authority, the court explained that the right to be free from criminal *charges*, not necessarily the right to be free from conviction, is a clearly established constitutional right supporting a section 1983 claim. (*Devereaux, supra*, 263 F.3d at p. 1075.)

■ The second and third points must also be rejected. There is no sound reason to impose a narrow restriction on a plaintiff's case by requiring incarceration as a sine qua non of a deprivation of a liberty interest. As our highest court has explained, "the liberty secured by the Fourteenth Amendment is significantly broader than mere freedom from physical constraint. Although its contours have never been defined precisely, that liberty surely includes the right to make basic decisions about the future; to participate in community affairs; to take advantage of employment opportunities; to cultivate family, business, and social relationships; and to travel from place to place." (*Albright v. Oliver, supra*, 510 U.S. at p. 294 (dis. opn. of Stevens, J.); see *Washington v. Glucksberg* (1997) 521 U.S. 702, 718 [138 L.Ed.2d 772, 117 S.Ct. 2258] [the "liberty" protected by the clause includes more than the absence of physical restraint].)[8]

■ Defendants acknowledge plaintiff's citation of *Ricciuti v. New York City Transit Authority* (2d Cir. 1997) 124 F.3d 123 but dismiss that case as an "anomaly." We find its reasoning sound, however. In *Ricciuti*, the plaintiff brought suit under section 1983 based on the use of a fabricated confession. When the defendant officer who had constructed the "confession" failed to testify in support of it, the charges against Ricciuti were dismissed. The Second Circuit found error in the district court's grant of summary judgment, because triable issues of material fact existed as to whether another defendant officer knew that Ricciuti had not made the claimed statements and nonetheless forwarded the "confession" to the prosecutor. The court rejected these officers' claim that the fabricated evidence was not material: "No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an

---

[8] Plaintiff asserts a "real and severe" deprivation of his liberty through having had "sexual assault charges hanging over his head for nineteen months, with a fear of conviction and years of imprisonment, to be followed by sex offender registration and its attendant humiliation, castigation, and restrictions; he was offered plea deals, which he anguished over but ultimately rejected because of his innocence; he was required to attend all court proceedings in person; he was restricted by a 'protective order' limiting his freedom of movement; he had to pay bail and post a property bond, which put ownership of his house at risk; and he had substantial legal fees for his defense."

arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.' [Citations.]" (124 F.3d at p. 130.) Consequently, the court held that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." (Ibid.) Summary judgment was therefore not available to the defendant officers on the ground of qualified immunity; the officers' alleged conduct violated Ricciuti's "clearly established constitutional rights, and no reasonably competent police officer could believe otherwise." (Ibid.)

Defendants urge us to reject Ricciuti and instead follow Hennick v. Bowling (W.D.Wn. 2000) 115 F.Supp.2d 1204, another case involving a fabricated confession. The district court in Hennick quoted extensively from Ricciuti but then went on to find no deprivation of liberty and thus no right giving rise to a section 1983 claim, because (a) there was probable cause to arrest the plaintiff even in the absence of the fabricated evidence and (b) the false confession did not "impinge on plaintiffs' [(Ricciuti's and Hennick's)] constitutionally protected rights." (Hennick, at p. 1209; cf. Galbraith v. County of Santa Clara (9th Cir. 2002) 307 F.3d 1119 [poorly performed autopsy covered up in coroner's false testimony supported violation of 4th Amend., not substantive due process].) The district court acknowledged that falsified information given to a prosecutor could deprive a defendant of liberty or a fair trial, but it concluded that "such a calamity did not occur in either Ricciuti or this case." (Hennick, supra, at p. 1208.) Instead, these plaintiffs were, in the court's view, deprived of their liberty for reasons independent of the false confessions · because there was probable cause to arrest them anyway. The court also noted that the plaintiffs in both cases were arrested before the fabricated evidence came to light. The district court thus disagreed with and departed from the Ricciuti holding.

Likewise, here defendants argue that the fabricated lab report did not contribute to the harm plaintiff alleges. In addition to the fact that he was not convicted or incarcerated, "[h]is arrest and prosecution were valid exercises of police power and were fully supported by probable cause to believe he had

committed a serious crime. As a matter of law, the evidence against him was sufficient to have resulted in holding him over to face a criminal trial, even in the absence of the testimony about the fake report. Indeed, when one actually evaluates the substance of the fake report, it is apparent that the evidence presented in it was not incriminating."

■ This argument raises more questions than it answers. What it does above all is accentuate the difficulty of meeting a moving party's burden on summary judgment or summary adjudication when the underlying facts have never been established. Even if there was probable cause to arrest plaintiff, we cannot say as a matter of law on the record before us that he would have been subjected to continued prosecution and an unfavorable preliminary hearing without the use of the false lab report and testimony derived from it. These are questions of fact which defendants appear to concede are material to the issue of causation, and which cannot be determined without weighing the evidence presented and conclusions reached at the preliminary hearing. (See *Ricciuti, supra*, 124 F.3d at p. 130 [rejecting officers' claim that the fabricated evidence was not material].) Defendants' statement of undisputed facts does not establish lack of causation as a matter of law.

A central point of dispute in the superior court was the applicability of *Devereaux, supra*, 263 F.3d 1070, where false evidence was used in an investigation of child sexual abuse. The parties continue to debate the significance of this case.

■ In *Devereaux*, the plaintiff was charged with sexually abusing his foster children after an investigation turned into a "witch hunt." (*Devereaux, supra*, 263 F.3d at p. 1073.) After the felony charges were dropped in exchange for a guilty plea to two misdemeanors unrelated to sexual abuse, Devereaux brought a section 1983 action. On appeal after a grant of summary judgment, the Ninth Circuit affirmed. The court clearly stated, however, that "the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious . . . [and] the right to be free from such charges is a constitutional right." (*Devereaux*, at p. 1075.) As noted earlier, the court did not require conviction as a factual predicate for establishing that right. (See also *Brown v. Jones* (D.Mont., May 21, 2009, No. CV 08-149-M-DWM-JCL) 2009 U.S.Dist. Lexis 44587 [rejecting proposed extension of *Devereaux* to require conviction to support fabrication-of-evidence claim under § 1983].)

The remaining portion of the *Devereaux* court's analysis—which led to the test defendants urge us to apply here—pertained specifically to investigations of suspected criminal activity. The court required Devereaux, in support of his "deliberate-fabrication-of-evidence claim," to point to evidence of at least one of the following: "(1) Defendants continued their investigation of Devereaux despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." (*Devereaux, supra*, 263 F.3d at p. 1076.) Devereaux, however, had failed even to allege facts bearing on these questions, nor did he show that coercive interview techniques had yielded any false testimony. (See also *Milstein v. Cooley* (C.D.Cal. 2002) 208 F.Supp.2d 1116, 1122–1123 [granting summary judgment based on application of *Devereaux* to perjury-related investigation].)

Unquestionably the *Devereaux* criteria are specific to the conduct of law enforcement personnel during investigations. The fact that the court discussed knowledge of the suspect's innocence cannot be divorced from its context— the use of coercive interview techniques—and applied to every fabrication-of-evidence claim.

In his reply brief, plaintiff calls attention to a subsequent Ninth Circuit decision, *Costanich v. Dept. of Social & Health Services* (9th Cir. 2010) 627 F.3d 1101. In that case the plaintiff's foster care license was revoked and her guardianship terminated after a social worker's investigation purportedly revealed emotional abuse of the children in the plaintiff's care. After the revocation was overturned, she brought a section 1983 action. Reviewing the district court's grant of summary judgment, the appellate court held that as to the fabrication claim, summary judgment was inappropriate, because there were genuine issues of material fact based on evidence that the social worker had "deliberately falsified [witness] statements in her investigative report and declaration." (627 F.3d at p. 1111.) Constitutional violations could occur not only by employing coercive interview techniques known to yield false evidence, but also by deliberately mischaracterizing witness statements and falsely claiming to have interviewed witnesses.

Finally, defendants contend that the facts of this case do not rise to a constitutional violation by Christian. They remind us that plaintiff was never incarcerated and the charges were eventually dismissed; and they maintain that the ruse lab report was not material, or even incriminating, as all it showed was that plaintiff used the blanket in the course of some sexual act.

We have already rejected the first of these arguments, as a deprivation of liberty may be established regardless of whether the plaintiff was convicted or even incarcerated. Whether the court in the *criminal* proceeding considered the false report significant enough to hold plaintiff over for trial is not a question that may be summarily adjudicated on the record presented here, but requires a determination by the trier of fact.

Having failed to show that the undisputed facts compel judgment in their favor on the first cause of action, defendants were not entitled to adjudication of this claim. Accordingly, it is not necessary to reach the second step of summary adjudication analysis, a determination of whether plaintiff has raised a triable issue of material fact on the allegations directed at Christian's conduct.[9]

b. *Second Section 1983 Cause of Action*

In his second cause of action, plaintiff alleged that the violation of his constitutional rights was caused by the City's "customs, policies, directives, practices, acts, and omissions," including the inadequate training of its officers on the fabrication of evidence, perjured testimony, and the obligation to produce exculpatory evidence. In their summary judgment motion defendants argued that the second cause of action failed because plaintiff "can point to no policy within the San Jose Police Department that led to any constitutional violation. . . . [¶] . . . Obviously there is no such policy and Plaintiff will not be able to establish any such policy." Defendants took issue with any suggestion that using ruse reports was unconstitutional; on appeal, however, defendants acknowledge that plaintiff was not asserting such a position, nor was he alleging a policy to allow or encourage perjury. Instead, they maintain that plaintiff's allegation of failure to train officers with deliberate indifference to the "highly predictable consequence" of a constitutional violation is unsupported by the evidence produced in the proceeding.

 Section 1983 does not assign liability to a local government under a respondeat superior theory, but the entity may be liable if the constitutional

---

[9] We express no opinion whatsoever as to the adequacy of plaintiff's evidence at this stage of the proceedings. In his opposition to the summary judgment motion, plaintiff offered the following facts relating to additional evidence falsified by Christian: (1) Christian falsely stated in his case update that he had taken Jane Doe to Christian's house, that she had located the bedspread, and that she had shrieked and run away when she saw it; (2) to support issuance of the search and arrest warrants, Christian falsely stated that plaintiff was hostile during his first prearrest interview; and (3) Christian falsely stated that he had never conducted a postarrest interview of plaintiff.

violation was caused by its official policy, practice, or custom. (*Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 690–694 [56 L.Ed.2d 611, 98 S.Ct. 2018].) In this case plaintiff relies on the theory that the City failed to train its officers on the proper use of ruse reports to avoid the recurrent risk of confusion with genuine evidence. ██ The United States Supreme Court has made it clear that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." (*Canton v. Harris* (1989) 489 U.S. 378, 388 [103 L.Ed.2d 412, 109 S.Ct. 1197].) When training is said to have been so inadequate as to represent city policy, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." (*Id.* at p. 390, fn. omitted.) Conversely, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." (*Id.* at pp. 390–391.) Finally, "the identified deficiency in a city's training program must be closely related to the ultimate injury. . . . [¶] . . . [P]ermitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell*, 436 U.S., at 693–694 [98 S.Ct. at p. 2037]." (*Id.* at pp. 391–392.)

In its summary adjudication order the court acknowledged that an officer had expressed concern that a ruse document "could be confused as a real document and lead to significant problems, but that no action was taken . . . and the [police] department never devised a formal policy to prevent an unmarked ruse report from being introduced in court despite the fact that it had occurred previously."[10] The court ruled, however, that these facts "do not establish that [the] City had a policy or custom to have its officers provide perjured testimony. Nor do these facts demonstrate that [the] City systematically failed to train its officers such that it would lead to officers providing

---

[10] Sergeant Todd Trayer had written a memo warning department members about what could happen if a ruse document were treated as genuine during a trial. He spoke to Sergeant Abruzzini about the memo, but his recommendation was not implemented.

perjured testimony."[11] The superior court also stated that defendants had offered evidence that Christian's testimony was not the result of any City policy to provide perjured testimony, but instead occurred "because Christian wanted to try something to bring out the truth, and then failed to remember that he created the ruse report."

In our view, this reasoning merely sidesteps the ultimate question of whether inadequate training amounting to deliberate indifference led to Christian's misuse of the ruse report. Whether the City had a "policy or custom to have its officers provide perjured testimony" is not properly at issue. And the court went astray in requiring plaintiff to "demonstrate" a systematic failure to train officers with "perjured testimony" as a consequence.

Aside from the self-serving nature of Christian's claim that he had "completely forgotten" that the report was "fake" when he testified, we believe the City's showing is insufficient to justify summary adjudication here. The statement of undisputed facts contains nothing whatsoever regarding City training, supervision, or policy related to the handling of evidence, fabricated or otherwise.[12]

Thus, whether Christian forgot or deliberately misrepresented the findings of the crime lab (an issue that was clearly in dispute)[13] is independent of the question of whether the alleged harm was caused by inadequate training amounting to deliberate indifference by the City. Because defendants did not sustain their own threshold burden to present undisputed facts justifying adjudication of this cause of action in their favor, the burden should not have shifted to plaintiff to produce evidence raising a triable issue of fact on the training issue.

---

[11] We take a broader view of the issue defined by the allegations of the second cause of action. Plaintiff was not claiming that the City had a policy to promote perjury, but that the persistent failure to train officers in the use of ruse reports would result in incorrect testimony and "the use of false inculpatory material," regardless of the motive of the officer taking the stand.

[12] Although not referenced in the City's statement of undisputed facts, Lieutenant Cornfield testified in his deposition that in a meeting he orally told his subordinates to mark ruse documents after their use; but he did not know that this "ever became a formal policy, certainly not a written formal policy, but it was hey, it was more like telling the officers that were at that meeting we have to make sure we mark stuff." He had heard of a problem before this case arose, in which a ruse document was introduced in court by a district attorney. The possibility of its inappropriate use gave the lieutenant concern that it would "cause embarrassment to anybody involved in the case."

[13] Brooke Barloewen testified that the lab report used in this case had "a number of obvious things" that indicated that "it clearly . . . was not generated by the crime laboratory." And Sergeant Trayer noted that listing the nonexistent "Rebecca Roberts" as the analyst was a "strong indication that this was a ruse report."

### 4. *Proposed Amendment of the Complaint*

 Plaintiff did not plead conspiracy in his complaint, but during the summary judgment proceedings he asked for leave to amend in order to add a conspiracy claim. Citing Code of Civil Procedure section 473, subdivision (a)(1), the court ruled that "such a request . . . requires notice to the adverse party." We do not read the statute to impose such a limitation on a party. It specifically states that for amendments other than correcting mistakes in the pleading, the court *may* permit the amendment after giving notice to the adverse party. The court appears not to have exercised its discretion in this respect, and defendants do not attempt to defend the ruling on this ground.

Instead, defendants rely on their primary argument that no constitutional rights were violated by the use of the ruse report. If we were able to reach that conclusion, we would agree with defendants that whether Christian and the district attorney colluded to present the false evidence would be immaterial. But as we cannot accept that premise as a matter of law, we must reject defendants' position. This is not an issue involving abuse of discretion; as we explained above, the court did not exercise its discretion as permitted by Code of Civil Procedure section 473. Moreover, defendants concede that plaintiff "sets forth a good deal of evidence that either Officer Christian and/or D.A. Stringfield should have realized that the ruse report was fake, suggesting that one or both of them actually knew that it was."[14] Since this case is returning for further proceedings, plaintiff should have another opportunity to seek amendment of his pleading. While we see no reason to deny amendment, nor have defendants offered any (other than "it would be futile to amend" since there is no constitutional violation), this will be a matter for the trial court to determine in its discretion and in light of the " 'strong policy in favor of liberal allowance of amendments.' " (*Burkle v. Burkle* (2006) 141 Cal.App.4th 1029, 1042 [46 Cal.Rptr.3d 562]; cf. *Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403, 1423 [74 Cal.Rptr.3d 61] [denial of amendment is abuse of discretion when opposing party is not misled or prejudiced].)[15]

---

[14] Defendants implicitly acknowledge the following evidence offered by plaintiff: Christian had asked the lab for the results and had received the report showing no semen on the bedspread; over the course of nearly a year the district attorney had refused defense counsel's repeated requests to see the data underlying the purported lab report; the "report," according to Barloewen and Trayer, was unmistakably a forgery, given the "number of obvious things that were wrong with it"; and the charges against plaintiff were dropped immediately after defense counsel threatened to move for dismissal on the ground of perjury by Christian.

[15] This conclusion makes it unnecessary to address plaintiff's alternative argument, that if Christian did fail to inform the prosecutor that he was relying on false evidence, he violated *Brady v. Maryland, supra,* 373 U.S. at page 87.

*Disposition*

The judgment is reversed. The matter is remanded for reconsideration of plaintiff's amendment request and for trial or other disposition of the first two causes of action. Plaintiff is entitled to his costs on appeal.

Premo, Acting P. J., and Lucas, J.,[*] concurred.

Respondents' petition for review by the Supreme Court was denied December 21, 2011, S197936. Werdegar, J., did not participate therein.

---

[*]Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.