Filed 2/10/16  DeJohn v. Wheeler CA1/3
Received for posting 3/4/16

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LISA DEJOHN,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DAVID WHEELER, et al.,<br><br>     Defendants and Appellants;<br><br>DARREN WALLACE, as Successor Trustee, etc.<br><br>     Real Party in Interest and<br><br>     Respondent. | A137825, A138421<br><br>(City & County of San Francisco Super. Ct. No. PTR09292931)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed January 21, 2016, be modified as follows:

In the carryover paragraph at the top of page 22, in the sentence that begins with the word "Moreover," the words "sole discretion," currently in quotation marks, are deleted and replaced with the word "discretion," without quotation marks.

There is no change in the judgment.

The petition for rehearing is denied.

Dated: _____          _____

                                  Pollak, Acting P.J.

1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LISA DEJOHN,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DAVID WHEELER et al.,<br><br>     Defendants and Appellants;<br><br>DARREN WALLACE, as Successor Trustee, etc.<br><br>     Real Party in Interest and<br><br>     Respondent. | A137825, A138421<br><br>(City & County of San Francisco<br>Super. Ct. No. PTR09292931) |

This case concerns management of a family trust.  Margaret and James Narron established the trust with their community property, in part to minimize the tax owed by their two children upon the death of the surviving spouse.  After the death of one of them, the surviving spouse was to become trustee with authority to manage the trust assets.  At the death of the surviving spouse, the Narrons' children were to share equally in the remaining assets.  To maximize the tax benefits, the surviving spouse trustee's ability to take money from the trust was restricted.  Distributions of principal and interest had to be approved by an independent trustee.

Margaret survived James.  She made payments to herself from trust assets without the approval of the independent trustee, Margaret's accountant David Wheeler, who apparently forgot that he had been appointed to act in that capacity.  A substantial portion

1

of the money Margaret took from the trust went to her son, Stephen Narron (Stephen). When her other child, Lisa DeJohn, learned of the trust, the funds used by Margaret, and the money given to Stephen, she petitioned to restore assets to the trust, and to remove Margaret and Wheeler as trustees. DeJohn alleged that Margaret and Wheeler were liable for breaches of fiduciary duty, that the accounting firms with which Wheeler was affiliated, LMGW C.P.A., APC (APC) and LMGW C.P.A., L.L.P., (LLP) were vicariously liable for his misfeasance, and that the trust was the rightful owner of a home in Colorado that Stephen acquired and improved with the help of money from the trust.

The trial court ruled for DeJohn on all issues. It held Margaret, Wheeler, APC, and LLP jointly and severally liable for all of the money Margaret used from the trust, with interest from the date of each distribution. It found Stephen liable for the trust assets he received, with interest, and held Margaret, Wheeler, APC, and LLP jointly and severally liable with Stephen to repay those same funds. It held Margaret liable for DeJohn's attorney fees in the case, and Margaret and Wheeler jointly and severally liable for DeJohn's attorney fees in a prior action on the trust she instituted in Colorado. Margaret, Wheeler, APC, and LLP have appealed from the judgment.

On Margaret's appeal, we conclude that: (1) the successor and independent trustee, Darren Wallace, has standing to defend the judgment on behalf of the trust; (2) Margaret is liable to the trust to repay unauthorized distributions; (3) Margaret was authorized to take distributions from the trust that Wheeler approved at trial and after the sale of a trust asset in 2000; (3) the sums Margaret provided Stephen were loans she was authorized to make from the trust; (4) Margaret is potentially liable for prejudgment interest at the rate of ten percent per annum on her unauthorized distributions if her actions are found to have been unreasonable and in bad faith, which must be reconsidered in light of our opinion; (5) Margaret's liability for DeJohn's attorney fees in the case must also be reassessed in light of her significant success in this appeal; and (6) Margaret is liable for DeJohn's attorney fees in the Colorado action.

On Wheeler's appeal and those of APC and LLP, we conclude that Wheeler is not liable for any breaches of duty to the trust, a conclusion that relieves APC and LLP of

2

any liability, and that Wheeler is not liable for DeJohn's attorney fees in the Colorado action.

Margaret's liability to the trust is significantly reduced and must be recalculated by the trial court. Wheeler, APC, and LLP have no liability. Thus, we reverse most of the judgment.

## I. BACKGROUND

A. <u>The Trusts</u>

In 1991, Margaret and her late husband James Narron (James) established the Narron Family Trust (the Trust). The Trust was fully funded with community property real estate in San Jose, Scotts Valley, San Francisco, and Sunnyvale, California. The Trust provided that, upon the death of the first spouse, two trusts would be created, an irrevocable Decedent's Trust, which is the focus of this action, and a Survivor's Trust. The Decedent's Trust would receive the maximum amount that could pass to non-spousal beneficiaries free of federal estate tax, and the Survivor's Trust would receive the remainder of the Trust's assets. Upon the surviving spouse's death, the assets in the Decedent's Trust and the Survivor's Trust would be divided equally between Stephen and DeJohn.

The Decedent's Trust would be administered by the surviving spouse as trustee, and by an independent trustee. Wheeler, who was James and Margaret's accountant, is named in the Trust as the independent trustee, and he executed the Trust agreement in that capacity. Article IX of the Trust provides: "The Trustee shall pay to the surviving Trustor such amounts of income as the Independent Trustee, in its sole discretion, deems appropriate." It further provides: "In addition to the income payments hereinabove provided, the Independent Trustee shall pay to the surviving Trustor such amounts of principal as the Independent Trustee, in its sole discretion, deems appropriate for his or her comfortable support, care and maintenance, including a reasonable number of the luxuries of life." Article XV states that the independent trustee's duties are "limited to those duties specifically set aside to her (*sic*) in Article IX . . . ."

3

Wheeler testified that the Survivor's Trust and the Decedent's Trust were "classic . . . A/B trust[s]." DeJohn's expert witness, Michael Boerio, testified that the Decedent's Trust, the "B" or "tax bypass," trust, was structured so "there were not enough inciden[ces] of ownership for [Margaret] in that trust to cause it to be included in her estate for estate tax purposes. She had the right to receive an income distribution if it was approved by an independent trustee. She had the right to receive a principal distribution . . . if it was approved by an independent trustee. That's not a sufficient inciden[ce] of ownership." Wheeler's expert witness, Francis Doyle, testified that same tax advantage could be gained without an independent trustee by restricting the surviving spouse's use of B trust assets to expenses for health, education, maintenance, and support. Boerio said it was uncommon "to have an independent trustee appointed whose permission is needed to make distributions of income or principal." He had not drafted any such provisions for 30 years because of the "problems surrounding [their] administration."

The Trust states that it was created "principally as a means of providing a convenient vehicle for the administration of [the trustors'] property during their lifetime and upon the death of one of the Trustors. In exercising any discretion herein provided for the Trustee, after the death of a Trustor, the Trustee shall regard the interest of the surviving Trustor as primary . . . ." The Trust grants the surviving spouse trustee the power to "exercise full rights, powers and dominion over the property, the same as an owner thereof," including the right to sell property, borrow money, and make investments.

When James died in 1996, Margaret retained Wheeler to divide the Trust assets. In 1996, the maximum amount that could pass to non-spousal beneficiaries free of estate tax was $600,000. The Decedent's Trust was thus funded with the Sunnyvale property, valued at $537,278, and a 25.19 percent interest in the Scotts Valley property, valued at $62,722.

B. Margaret's Dealings With Trust Property

4

In March of 2000, Margaret sold the Sunnyvale property for a gross sale price of $1,350,000. She transferred $700,000 of the proceeds into a Fidelity Investments account in her name as trustee of the Decedent's Trust; used $133,000 of the proceeds to purchase a condominium at 3900 South Rifle Court in Aurora, Colorado (3900 South Rifle) in the name of the Decedent's Trust; and kept $70,000 for herself. In March 2001, Margaret withdrew $128,490.50 from the Fidelity account to purchase a condominium at 3930 South Rifle Court in Aurora (3930 South Rifle), also in the name of the Decedent's Trust. In August 2001, Margaret sold the Scott's Valley property for 405,000. The Decedent's Trust 25.19 percent interest in the proceeds was $102,019.50. Margaret used Scott's Valley proceeds to purchase 1249 Harrison Court in Boulder, Colorado (Harrison Court).

Citing the Fidelity account ($700,000), 3900 South Rifle ($133,000), the Scott's Valley property ($102,000), and the money Margaret retained from the Sunnyvale sale ($70,000), the trial court noted that the Decedent's Trust was at one time worth at least $1,005,000.

Stephen moved to Colorado in 2000 or 2001, living first at 3900 South Rifle and then at 3930 South Rifle. In 2002 or 2003, he purchased 2570 South Carey Way in Denver (2570 South Carey) for $180,000 he received from Margaret. He testified that he planned to renovate the home on the property, sell it at a profit, and split the profits "about . . . half to me and half to [Margaret]." He thought only an additional $150,000 would be needed for the renovations. But the project greatly expanded when defects in the property were discovered that required its demolition.

Margaret, 83 years old at the time of trial, testified that she was "really mad" when she learned Stephen had demolished the home at 2570 South Carey. She had been lending Stephen money from the Survivor's Trust, and more loans from that trust would now be required for the project. Eventually, she had to loan Stephen money from the Decedent's Trust to protect her earlier investments. She said that if he did not finish the house he was building, he could not repay her.

Stephen said that the house was finished in 2006. He unsuccessfully tried to sell it beginning in February or March 2007 for $1.4 million. In September 2007, Margaret

5

wrote a document stating that Stephen had borrowed money from her, the Decedent's Trust was owed $500,000, the Survivor's Trust was owed $258,000, and the Decedent's Trust was the " 'first priority to be repaid.' "  Stephen has lived at 2570 South Carey since 2008.

DeJohn testified that she first learned of the Decedent's Trust in November 2007. She said Margaret "told me that there is a decedent's trust and that I was a beneficiary and that it was depleted and that most of the money had gone to my brother."  "[S]he told me that I could sue her for that."

Margaret sold 3900 South Rifle in 2004 for $133,000.  She put the proceeds in a personal bank account, transferred $100,000 to Stephen, and used $33,000 to pay her personal expenses.  She sold 3930 South Rifle in 2008 for $155,000.  $92,865 of the proceeds were traced to payment of amounts owed by Margaret on a line of credit. Margaret prepared an accounting listing $97,586.31 of the sale proceeds as a loan to Stephen.  In 2009, the Survivor's Trust purchased the Decedent's Trust's interest in Harrison Court for a $81,867 promissory note, secured by the San Jose property still owned by Margaret.

By the time of trial, the Decedent's Trust's only asset was this $81,867 promissory note.  Stephen testified that he owed Margaret "a little under $1.2 million," but he did not know how much he owed the Decedent's Trust or the Survivor's Trust.

C. Wheeler, APC, and LLC

Wheeler testified that he owned his own accounting firm until 2002, when he went to work full time as chief financial officer of a San Diego company.  At that time, he sold 90 percent of his tax practice to APC, including "the part associated with the Narrons." He was then acting as trustee of a number of trusts, and his services as trustee were not part of the sale.  He explained that "[t]here's really no way to transfer a trust relationship . . . ."  APC dissolved in 2008 or 2009.  Wheeler said that, when APC dissolved, its clients were distributed to its shareholders, and "LLP was formed and more partners were added to the LLP at that time."  He said that partners' work as trustees is done outside LLP, and LLP receives no compensation for trustee services.  LLP prepares tax returns

6

for the trusts in which he is a trustee, and LLP is paid for that work. Wheeler conceded that his trusteeships served as an excellent way for LLP to maintain the trusts as tax clients.

Wheeler admitted signing the Trust agreement. He did not remember reading it, but said he would likely have skimmed the document for provisions that pertained to him. He did not remember being named as independent trustee in the Trust until he was contacted by a Colorado attorney in 2009.

DeJohn's expert Boerio testified that it would be standard practice for an accountant allocating assets between A/B trusts to read the trust agreement. Wheeler testified that he did not necessarily need to review the Trust in order to make the allocation. He said he generally prepares such allocations based on a request of counsel, who "would provide us with all the values" involved, and advise if there were "any unusual circumstances with the trust." However, Wheeler acknowledged that it was necessary to determine, when tax returns for the Decedent's Trust were prepared beginning in 1996 or 1997, whether the trust was a "simple" or "complex" one for tax purposes. He said that in order to make this determination, "[y]ou need to understand what the trust instrument says." He explained that a simple trust is one that requires distribution of all its net income to the beneficiaries at least annually, and that all other trusts are considered complex. A trust like the Decedent's Trust that left distributions to the discretion of an independent trustee was "[b]eyond the scope of a simple trust."

Wheeler testified that he "volunteered" in 2009 to act as the independent trustee of the Decedent's Trust because he thought that resolving DeJohn's concerns would be a "simple process" because "Margaret had lots of assets in the survivor's trust. So she could improve the decedent's trust by putting other assets in there . . . ."

Margaret testified Wheeler told her that at the time she sold the Sunnyvale property she could take $3,000 to $4,000 per month out of the Decedent's Trust. He did not tell her, and she did not know, whether he gave that advice as the independent trustee of the Decedent's Trust, but she believed "at the time that he did have power to speak . . . for the trust." Wheeler testified that he had not approved any distributions to Margaret

7

from the Decedent's Trust. He said that he writes a check or otherwise documents any distribution from a trust that he approves as trustee, and that he had no record of any distributions to Margaret as of the time of trial.

At trial, Wheeler testified that he was authorizing, in his capacity as independent trustee of the Decedent's Trust, distributions to Margaret of the $204,087 in income shown on tax returns for the trust from 2001 to 2009. Experts Boerio and Doyle agreed that annual distribution of income is the best practice, because income remaining in the trust is taxed at a higher rate. Wheeler testified that he was not approving any distributions of principal.

D. The Colorado Action

In February 2009, DeJohn petitioned a Colorado court for an accounting of the Decedent's Trust. Margaret agreed to provide it, DeJohn withdrew her petition, and an accounting was provided in April 2009. In July 2009, DeJohn petitioned for a further accounting alleging that the one Margaret provided was incomplete, and for removal of Margaret as trustee of the Decedent's Trust. Margaret furnished a second accounting in September 2009. At trial, Margaret admitted various inaccuracies in the accountings.

Margaret filed an affidavit in the Colorado action averring that her primary residence was in San Francisco. The affidavit stated that she had "a secondary residence" at Harrison Court in Boulder, but that San Francisco was "the usual place where she carrie[d] on day-to-day activities as trustee." At trial, Margaret testified that she moved to Harrison Court in October 2008, obtained a Colorado identification card, and registered to vote there. Wheeler filed an affidavit in the Colorado case stating that he was the independent trustee of the Decedent's Trust, and that "[h]is day-to-day activities" in that capacity, "such as reviewing requests for distributions from the trust," were conducted in California. Wheeler admitted telling Margaret's attorney that he had forgotten that he had been named independent trustee. He acknowledged his duties as independent trustee to review and approve distributions from the Decedent's Trust, but said he had never been asked to approve, or had approved, any such distributions.

8

DeJohn testified that she dismissed the Colorado action because she did not believe she could prevail in light of Margaret's and Wheeler's affidavits that trust business was conducted in California.

E. This Action

DeJohn commenced this case in November 2009. Her second amended petition named Margaret, Wheeler, LLP, Stephen, his wife, Conni George Narron (Conni), and Does 1-50 as respondents. The petition alleged that Margaret and Wheeler should be surcharged for breach of duties to the Decedent's Trust, and removed as trustees. The petition alleged that LLP was vicariously liable for Wheeler's wrongdoing, and that the Decedent's Trust was entitled to the 2570 South Carey property owned by Stephen and Conni. The petition sought injunctive relief, attorney fees, and a further accounting. During trial, DeJohn moved to add APC in place of Doe 1 as a respondent, on the basis that she was unaware of APC's existence until "right before the trial commenced."

F. The Statement of Decision

The court filed a statement of decision ruling for DeJohn. The court found that Margaret failed to comply with the Decedent's Trust's requirement that she obtain approval from the independent trustee before taking distributions, and breached multiple duties she owed to DeJohn as trustee. She breached her duty of loyalty by taking unauthorized distributions for her personal use, including distributions taken to protect her investment in 2570 South Carey. (Prob. Code, § 16002 [trustees are to "administer the trust solely in the interest of the beneficiaries"].) She had a conflict of interest with DeJohn in 2570 South Carey, and engaged in impermissible self-dealing on that property. (Prob. Code, § 16004 ["the trustee has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust, nor to take part in any transaction in which the trustee has an interest adverse to the beneficiary"].)

Margaret breached her duty to treat Stephen and DeJohn impartially. (*Penny v. Wilson* (2004) 123 Cal.App.4th 596, 604 ["the trustee must act impartially toward all beneficiaries"].) "Margaret's delivery of approximately $500,000 of Decedent's Trust funds to Stephen completely thwarted James Narron's testamentary plan to benefit his

9

children equally from the Decedent's Trust." The court rejected Margaret's claim that the Decedent's Trust had made loans to Stephen. "The evidence showed that these were not loans and that there is no legitimate plan for repayment. . . . Instead, they were distributions from the Decedent's Trust to Margaret, in her personal capacity, followed by subsequent gifts from Margaret to Stephen."

Margaret improperly commingled her assets with those of the Decedent's Trust. (Prob. Code, § 16009.) She "routinely transferred Decedent's Trust funds into her own Wells Fargo Account, which is titled in her name personally. . . . She then used the funds however she pleased, commingling her own personal funds with those which she had just caused to be distributed from the Decedent's Trust."

She violated her duty to preserve trust property by depleting the Decedent's Trust's assets. (Prob. Code, § 16006.) The money she paid in connection with 2570 South Carey violated her duty to diversify trust investments. (Prob. Code, § 16048 [investments must generally be diversified]). "While an investment scheme which places half a million dollars in one house would not run afoul of the diversity requirement in all trusts, viewing this alleged investment in its proper context and considering it in relation to the remaining assets of the Decedent's Trust, such an investment was a flagrant breach of the duty to diversify." Those alleged investments also violated the prudent investor rule. (Prob. Code, § 16047, subd. (a).) "No prudent person would use trust funds to pay her own bills and deliver approximately $500,000 to her own son, who was not a licensed contractor or architect, so he could build a speculation home in another state. . . . To the extent Margaret was incapable of prudently managing the Decedent's Trust or investing its assets, she should have delegated that authority to a qualified agent."

Margaret breached her duty to keep DeJohn informed of the Decedent's Trust's administration. (Prob. Code, § 16060.) "[DeJohn] testified that she did not learn of the [Decedent's] Trust's existence until November 2007, more that eleven (11) years after James Narron died." Margaret breached her duty to provide accurate accountings of the trust to DeJohn, admitting in her testimony that the accountings she produced were

10

inaccurate. (*Blackmon v. Hale* (1970) 1 Cal.3d 548, 560 [trustees must keep full and true accounts of their dealings with trust property].)

The court found that Wheeler also breached his duties under the Decedent's Trust by neglecting them and giving Margaret unlimited access to the trust's assets. (Prob. Code, §16000 ["[o]n acceptance of the trust, the trustee has a duty to administer the trust according to the trust instrument"].) The court rejected Wheeler's claim that he did not accept his appointment as independent trustee until 2009, before he signed the affidavit in the Colorado action stating that his activities in that capacity were conducted in California. The court determined that Wheeler agreed to act as independent trustee when he signed the Trust in 1991, and when he knowingly exercised powers of the independent trustee in 2000.

Wheeler was asked, "From the time you signed the trust in 1991 until you received a telephone call from a Colorado attorney in 2009, did you have any idea that you were named as independent trustee of the Narron Family Trust?" He answered, "No I don't remember and I don't believe so." The court did not believe this testimony.

The court wrote: "Assuming arguendo, Wheeler did not accept his role as Independent Trustee by signing the Trust instrument, he accepted by knowingly exercising powers and performing duties of the Independent Trustee. Specifically, Margaret testified that Wheeler told her she could take $3,000 to $4,000 per month from the Fidelity Decedent's Trust account when it was established on June 14, 2000. Wheeler's expert, Mr. Doyle, testified that approving of such distributions to Margaret was consistent with his duties as Independent Trustee so long as he knew he was named as Independent Trustee.

"The preponderance of the evidence at trial showed that Wheeler did read the Trust following James Narron's death, and therefore knew he was named as Independent Trustee. The evidence showed that he read the Trust to determine the correct names for the Trusts to put on the allocation sheet he prepared. . . . He also read the Trust before filing the initial fiduciary income tax return because he had to determine whether it was a simple or complex trust. In fact, the evidence showed that, in order to make the

11

simple/complex determination, he read the exact language from the trust which required the Independent Trustee to approve of distributions of income. Thus, the weight of the evidence showed that Wheeler read the Trust following James Narron's death and therefore knew he was named as Independent Trustee. Any testimony to the contrary was not credible."

The court found that, by abandoning his duty to approve distributions to Margaret, Wheeler breached his duty of loyalty to the remainder beneficiaries of the Decedent's Trust (Prob. Code, § 16002), his duty to reasonably exercise his discretionary power as independent trustee (Prob. Code, § 16080), and his duty to exercise reasonable care in that role (Prob. Code, § 16040). Wheeler also wrongly neglected to enforce claims of the Decedent's Trust (Prob. Code, § 16010) by failing to require that Margaret return funds she had taken from it. Wheeler's affidavit in the Colorado action, which falsely claimed that he was administering the trust in California, improperly favored Margaret's interests over those of DeJohn because it caused DeJohn to pursue a second action in California.

Boerio traced distributions of Decedent's Trust assets to Margaret from 2000 to 2009. The statement of decision identified the dates of the disbursements, which totaled $986,677, and added interest of ten percent per annum from the date of each disbursement, an additional $706,528.95. The court surcharged Margaret these amounts. (Prob. Code, § 16440, subd. (a)(1) [trustee is chargeable for any loss in value of the trust estate resulting from a breach of trust, with interest]; *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 922–923 (*Uzyel*) [awarding prejudgment interest at the rate of 10 percent].)

The court found that Wheeler's breaches of duty were also responsible for the losses suffered by the Decedent's Trust, and held him jointly and severally liable with Margaret for the foregoing amounts. The court granted DeJohn's motion to add APC as a Doe defendant, finding that APC and LLC "are substantially the same accounting firm and that it simply changed its entity formation." The court held APC and LLC jointly and severally liable with Wheeler, finding among other things that Wheeler's service as independent trustee was "broadly incidental" to the firms' business. (*PCO, Inc. v.*

12

*Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 391 (*PCO*).)

The court found that Stephen and Conni improperly received $500,000 belonging to the Decedent's Trust, and held them jointly and severally liable to the trust for that amount, plus prejudgment interest of $340,794. 53.

The statement of decision provided that "[t]he Decedent's Trust's total recovery of $1,693,205.95 ($986,677.00 + $706, 528.95) shall be in addition to attorney's fees."

The statement of decision also held Margaret and Wheeler jointly and severally liable to DeJohn personally for her attorney fees in the Colorado action. The court found that Margaret and Wheeler breached fiduciary duties owed to DeJohn by filing false affidavits in the Colorado case. Margaret falsely claimed to be residing in California, and Wheeler falsely claimed to be acting in California as independent trustee. Those misrepresentations caused DeJohn to dismiss the Colorado case, and lose the benefit of the attorney fees she incurred in that action.

The statement of decision removed Margaret as trustee and Wheeler as independent trustee of the Decedent's Trust.

E. Appointment of a Successor Trustee and Entry of Judgment

After the statement of decision was filed, and before entry of the second amended judgment (the judgment), Darren Wallace was appointed successor trustee and successor independent trustee of the Decedent's Trust.

The judgment held Margaret, Wheeler, APC and LLC jointly and severally liable for $1,693,203.89, the amount specified in the statement of decision and the "total amount of recovery to which the Decedent's Trust is entitled . . . to compensate for the loss suffered by the Trust and its beneficiaries." Stephen and Conni's liability was adjusted to $753,706.85, representing $500,000 plus $253,706.85 in interest. Margaret, Wheeler, APC, and LLP were made jointly and severally liable for the amount owed by Stephen and Conni, but to prevent double recovery the judgment specified that "[a]ny payment to the Decedent's Trust made by Stephen Narron or Conni Narron, or from the real property located at 2570 South Carey Way, Denver, Colorado, shall reduce the total

13

judgment owed to the Decedent's Trust." Stephen would be charged with any unpaid portion of the judgment against him when Margaret died. Margaret and Wheeler were made jointly and severally liable to DeJohn for her Colorado attorney fees of $45,967.53. Margaret was ordered to pay DeJohn's attorney fees of $363,340.42 in this case on the ground that her defense of the action was without reasonable cause and in bad faith. (Prob. Code, § 17211, subd. (b).)

The judgment noted that Wallace had been appointed successor trustee and independent trustee of the Decedent's Trust. The judgment stated that Margaret "is hereby removed" as trustee, Stephen "is disqualified" from acting as a successor trustee, and Wheeler "is hereby removed" as independent trustee.

F. Appeals

Margaret (Appeal No. A137825), Wheeler, APC, and LLP (Appeal No. A138421), and Conni (Appeal No. A138225), appealed from the judgment. Conni settled with DeJohn and we granted their request to dismiss her appeal. The other appeals were consolidated for purposes of briefing, oral argument, and decision.

## II. DISCUSSION

A. Margaret's Liability to the Decedent's Trust

(1) *Wallace's Standing*

Margaret challenges various facets of the judgment. DeJohn has filed a respondent's brief addressing Margaret's challenges to attorney fees. Wallace, in his capacity as successor trustee and independent trustee of the Decedent's Trust, has filed a respondent's brief addressing Margaret's other arguments. Margaret argues that Wallace has no standing to participate in her appeal for a number of reasons.[1] We granted

---

[1] We hereby grant Margaret's unopposed request for judicial notice of documents filed in the case after entry of judgment, which are offered to show that she objected in the trial court to Wallace's standing. Assuming an appellate objection to standing can be forfeited by inaction in the trial court (but see *Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 745 [such an objection can be raised for the first time on appeal]), we find no forfeiture here.

14

Wallace's request to file a respondent's brief without prejudice to any challenge to his standing to do so.

Margaret maintains that "allowing [a] successor trustee to oppose an appeal of his appointment is tantamount to enforcing the judgment on appeal." However, this is not "an appeal of [Wallace's] appointment." It is an appeal from a judgment entered after that appointment was made. The order appointing Wallace was appealable (Prob. Code, § 1300, subd. (c) [orders authorizing a fiduciary]), and Margaret did not appeal from it. Wallace's authority to act as successor trustee has thus been established by a final order that cannot be contested.

Margaret also argues that the appointment order did not take effect until the judgment was entered because, until then, Margaret had not been removed as trustee and there was no vacancy to fill. In these circumstances, Margaret submits that it would "exalt[] form over substance" to conclude that Wallace's appointment was not stayed by her appeal from the judgment. But finality of the appealable order of appointment is a substantive matter, and it is immaterial that Wallace and Margaret were for a time technically co-trustees.

Margaret contends that the appeals in this case stayed Wallace's appointment. Margaret speculates that if she "wins her appeal then a possible outcome is that her removal will be rendered null and void, and Wallace's appointment would also be null and void . . . ." But apart from this statement to support Wallace's alleged lack of standing, Margaret does not argue that she is entitled to reinstatement as trustee, and she identifies no factual or legal scenario that would justify that result.

Margaret argues that Wallace is not a real party in interest because this case is "in effect a battle between DeJohn and her" involving disputed claims to trust assets. Margaret invokes cases where "competing claimants to estate assets vie for ownership of those assets," and the executor or administrator "must stand apart from the dispute and maintain a posture of neutrality." She contends that, by filing a respondent's brief in opposition to her appeal, Wallace has favored DeJohn's interest in the trust over those of her and Stephen, and thereby violated his duty of impartiality.

15

This argument misstates the nature of the litigation. This case is not about beneficiaries' competing claims to trust assets. It is about misfeasance by trustees, one of whom happens to be a beneficiary. Moreover, the judgment creditor is Wallace as successor trustee of the Decedent's Trust. He has a duty to preserve recovery of the losses caused by Margaret's and Wheeler's breaches of duty. A trustee "owes fiduciary duties which require him to defend the trust corpus against unwarranted diminution until it is distributed to the beneficiaries." (*Estate of Goulet* (1995) 10 Cal.4th 1074, 1082.) A claim that "may substantially diminish the funds to be distributed . . . implicates the trustee's fiduciary duty to protect the trust corpus." (*Ibid.*)

Margaret argues that Wallace lacks standing because "DeJohn, through her nominee Wallace, is in essence seeking to have her mother's Trust pay for DeJohn's appellate legal fees. Most egregious about this is the fact that even if DeJohn loses the appeal it is Margaret that would be paying her legal fees, because it is her money that will be depleted. That is grossly inequitable." Margaret cites *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221 (*Whittlesey*) for this argument, but that case supports our conclusion that Wallace has standing.

*Whittlesey* considered whether counsel for a trustee could recover from the trust his fees for representing the trustee in litigation. The trust originally named Whittlesey as primary beneficiary, but the trustor amended the trust to designate others primary beneficiaries. Whittlesey challenged the amendment and the trustee serving after the trustor's death defended it. Whittlesey prevailed and the amendment was voided due to undue influence by the new primary beneficiaries. The court denied the trustee's attorney's claim for fees, finding that it would be unfair to Whittlesey to require the trust to pay them.

The court reasoned that "because the trust amendment was voided and Whittlesey's status as the primary trust beneficiary was restored, an award of fees to [counsel] from the trust would be, in effect, an award from Whittlesey. In other words, Whittlesey would be required to finance her own trust litigation and that of her opponent, despite the fact she prevailed. There can be no equity in that." (*Whittlesey*, *supra*, 104

16

Cal.App.4th at p. 1230.)  This reasoning rested on the fact that "the parties primarily interested in the outcome of the litigation were Whittlesey on the one hand and [the new primary beneficiaries] on the other.  To the extent [counsel] defended the amendment, he was representing the interests of one side of the dispute over the other, not representing the interests of the trust or the trustee."  (*Id.* at p. 1231.)

However, the court recognized that attorney fees would be compensable from the trust if they were incurred in "litigation [that] was for the benefit of the trust estate. . . . For example, the defense of a lawsuit that has the potential for depleting trust assets would be for the benefit of the trust, justifying the employment of counsel."  (*Id.* at p. 1227.)  " '[W]here litigation is necessary for the preservation of the trust, it is both the right and duty of the trustee to employ counsel in the prosecution or defense thereof, and the trustee is entitled to reimbursement for his expenditures out of the trust fund.' "  (*Id.* at pp. 1226–1227.)  Since the appeals in this case, unlike the litigation in *Whittlesey*, have "the potential for depleting trust assets," Wallace has both the "right and duty" to dispute them.  (*Ibid.*)  *Whittlesey* thus supports Wallace's standing.

(2)  *Credit for Approved Distributions*

Margaret testified that Wheeler told her that upon the sale of the Sunnyvale property in March 2000 she could take $3,000 to $4,000 per month out of the Decedent's Trust.  According to the statement of decision, Margaret testified that Wheeler said she could take this amount from the Fidelity account into which some of the Sunnyvale proceeds were deposited, but Margaret testified to amounts that could be taken from *all* of the sale proceeds.  "Q. . . . [D]id [Wheeler] also tell you that you could take three or $4,000 a month out of the trust each month after you sold the Sunnyvale property?  A. Yes. [¶] . . . [¶] Q.  Did you understand that the 3,000 or $4,000 a month Mr. Wheeler told you could take out of the decedent's trust was from the proceeds of the sale of Sunnyvale?  [¶] . . . [¶] A.  Yes."

In any event, the court apparently concluded Margaret's testimony was credible. In its statement of decision, the court found, on the basis of this testimony, that Wheeler was "knowingly exercising powers and performing duties of the Independent Trustee" in

17

2000, and thereby "accept[ed] his role as Independent Trustee" at that time. Despite this finding, the court further found that "Wheeler did not approve of any income or principal distributions from the time of inception of the Decedent's Trust up until the present." As Margaret observes, these findings are irreconcilable.

Margaret contends, and we agree, that she is entitled to credit against her liability to the Decedent's Trust of $4,000 per month beginning in March 2000 for the Sunnyvale proceeds she took with Wheeler's authorization, which the trial court determined was given in his capacity as independent trustee. Wallace argues this credit should be denied because the court found Margaret's "testimony lacked credibility on several issues, including her accountings and the amount of Decedent's Trust funds transferred to Stephen." However, the court believed Margaret's testimony about what Wheeler told her regarding the Sunnyvale sale. Wallace suggests that Margaret is not entitled to this credit because she "took large sums at irregular intervals in contrast with the alleged permission to take $3,000-$4,000 [per] month," but Wheeler's advice most reasonably means that Margaret was entitled to an aggregate amount as time went on, rather than a specific limit on what she could withdraw in any particular month.

We also agree with Margaret that she is entitled to credit for distributions of interest income shown on tax returns for the Decedent's Trust, as Wheeler approved at trial. Wheeler and his expert testified, and DeJohn's expert agreed, that such distributions are prudent, and nothing in the Trust prohibited their retroactive approval. The court found that Wheeler's retroactive approval of the income distributions was "an idle act," because DeJohn "contends that such income distributions violated the terms of the Decedent's Trust, but the Decedent's Trust was not damaged by them." We fail to follow this reasoning. Wheeler's belated approval of the distributions did not violate any term of the Trust and was not inconsequential. It determined whether Margaret permissibly or properly took them.

Wheeler testified that he was not approving distributions of principal at trial, but he could not retroactively negate the approval he gave Margaret in 2000 for the proceeds of the Sunnyvale property. That prior approval was separate from the approval of income

18

distributions he gave at trial, and must be taken to refer to distributions of principal. Margaret is entitled to credit for principal distributions of $4,000 per month as long as there were proceeds for her to take from the sale of the Sunnyvale property.

(4) *Credit for Loans From the Decedent's Trust*

Margaret contends that the sums she took from the Decedent's Trust and gave to Stephen were loans from the Decedent's Trust, not gifts, an argument Wallace characterizes as "the central tenet she advanced at trial." She contends that the evidence compelled a ruling in her favor on this issue, citing her testimony and that of Stephen that the amounts he received were loans, her testimony that she took out a $1,000,000 insurance policy on Stephen's life, and several trial exhibits, which she describes as "contemporaneous writings . . . acknowledging and/or reflecting the fact that Margaret had loaned Stephen sums . . . ."

Exhibit 14 is a September 2002 letter from Stephen to Margaret and "who it may concern," which "convey[ed] the spirit" of his agreement with Margaret. The letter states: "My mother, Margaret, established a line of credit for me. This line of credit is to be used only to purchase and remodel a single-family residence. The ownership in reality rests with her and in the event I was unable to complete the project for any reason, the project is hers to finish any way she deems reasonable. My interest in this project is to substantially upgrade the property and upon its sale, any monies above the line of credit balance would be realized as my profit."

Exhibit 15 is a June 2006 letter from Stephen to Margaret and "who it may concern" stating: "My mother, Margaret Narron, has loaned me in direct monies, accrued interest, and defer[r]ed rents a total of $1,200,000 (approximately). Margaret has all necessary documentation to substantiate the above amount."

Exhibit 16 is a September 2007 letter, mentioned earlier, from Margaret to "whom it may concern" stating that Stephen "borrowed money from me," $500,000 of the money came from the Decedent's Trust, additional amounts came from the Survivor's Trust, with the Decedent's Trust "first priority to be repaid."

19

Exhibit 18 is a "short note" dated July 7, 2008, from Stephen to Margaret "to make formal our verbal communications and previous agreements." The note stated, "I, Stephen Narron, son of Margaret Narron, will repay approximately half of the loan balance upon the sale of 2570 S. Carey Way, Denver. An amount of $500,000.00 will be directly transferred to Margaret Narron from escrow at closing. This note is for the protection of Margaret Narron in the event I, Stephen Narron become incapacitated or am no longer in the picture."

Exhibit 50 is a deed of trust on 2570 South Carey Way securing a $500,000 promissory note dated June 30, 2009, from Stephen to Margaret.

In its statement of decision, the court found that Margaret's September 2007 letter showed her "recognition and awareness that the Decedent's Trust has been depleted and that it must be repaid." Taking into account the other evidence Margaret cites, the court rejected her claim that she did not need the independent trustee's approval to take money from the Decedent's Trust to give to Stephen because the disbursements were for loans to him. The court wrote:

"Margaret did not provide the Court with a tracing of the money taken from the Decedent's Trust and allegedly loaned to Stephen. The evidence merely showed that she took large sums of money from the Decedent's Trust, placed that money into her personal account and then delivered some portion of it to Stephen.

"Stephen testified that he owed money to his mother and all of the documentary evidence supported that testimony. None of the notes he signed acknowledging his debt named the Decedent's Trust as the lender to be repaid. Instead, they all named Margaret Narron as the lender and stated that he would pay back the debt obligation to her. (Exs. 14, 15, 18.) In addition, there was testimony that Stephen had a life insurance policy that named Margaret Narron as the beneficiary, not the Decedent's Trust. Even the Deed of Trust on the South Carey Way property was executed in favor of Margaret Narron, and not the Decedent's Trust. (Ex. 50.)

"Furthermore, even if the funds had been delivered to Stephen directly from the Decedent's Trust, they still would not be loans. Loans have interest rates, fixed payment

20

schedules, and some reasonable prospect of the borrower repaying the funds loaned.  The transactions at issue here had none of these characteristics.

"Moreover, the terms of the alleged loans were different in every document relating to them . . . and the terms even changed throughout the course of Stephen's testimony.  He first testified that he and Margaret would split the profit upon the sale of the South Carey Way house.  Later he said that Margaret would be happy if she got to participate in *some* of the profit.  In a legitimate debtor/creditor relationship, the terms of the loan do not fluctuate this way."

Whether a payment is a loan or a gift is generally a question of fact, which "depends principally upon [the transferor's] intent at the time he advanced the funds . . . ." (*Burkle v. Burkle* (2006) 141 Cal.App.4th 1029, 1036.)  " 'In ascertaining the validity of a gift the intent with which delivery was made is an important and essential element to be considered.  Intention is a question of fact to be determined by the trial court from all the evidence, and the circumstances of the transaction and the words and acts of the donor enter into the establishment of the fact.  [Citations.]  As in any other case where the decision of the trial court is sustained by substantial evidence, the findings will not be disturbed on appeal although different conclusions may reasonably be drawn from the evidence by different minds.' " (*Matson v. Jones* (1969) 272 Cal.App.2d 826, 829.)

Margaret argues, and we agree, that "[t]here is not a scintilla of evidence in this record that [she] intended the amounts that went to Stephen to be gifts . . . ."  Although the terms of the loans were never formalized, there is no substantial evidence that they were anything other than loans.  Moreover, as Margaret observes, the court's decision is "inconsistent in charging Stephen with repayment of money that Margaret loaned him, but failing to give Margaret credit for lending it in the first place."

There are no grounds to hold Margaret liable for making the loans.  The Decedent's Trust restricted her dealings with trust assets only insofar as they were used for her living expenses.  She was otherwise entitled to treat trust assets for what they in essence were:  *her money*.  Under the terms of the trust, she had "full rights, power and

dominion over the property, the same as an owner thereof," including the right to "invest and reinvest any property held hereunder" as she saw fit. The trial court was mistaken when it found that Margaret had a duty "to preserve trust property" for the benefit of her children, and related duties to make prudent, diversified investments. She did not have a "duty of loyalty which require[d] her to administer the trust solely in the interest of the beneficiaries," or related duties to avoid conflicts of interest and self-dealing. The trust explicitly provided that her interests were *primary* to those of her children. Moreover, Margaret was empowered in her "sole discretion" to loan funds from the Decedent's Trust, "it being Trustors' intent that this discretion be exercised liberally." Margaret had every right to make loans to protect her investment in Stephen's project. The trial court found that Margaret failed to treat Stephen and DeJohn impartially, but its finding hinged on the determination that the money Stephen received was a gift, not a loan.

(4) *Prejudgment Interest*

The trial court found that all of the distributions Margaret took from the Decedent's Trust were unauthorized, and awarded prejudgment interest at the rate of 10 percent per annum from the date of each distribution as reflected on a chart in the statement of decision. Since Margaret is entitled to substantial credit against that liability, at a minimum prejudgment interest will need to be recalculated. Margaret argues that prejudgment interest could not be awarded, and that the rate of any such interest should be seven rather than 10 percent. We disagree on both points.

The award of prejudgment interest of 10 percent from the date of each unauthorized withdrawal of trust assets adhered to the decision in *Uzyel, supra,* 188 Cal.App.4th 866. In *Uzyel*, the beneficiaries of two trusts terminated the trusts and sued the trustee for breach of trust. The court held that the beneficiaries were entitled to prejudgment interest under Probate Code section 16440, subdivision (a)(1), on the damages caused by the trustee's failure to protect the value of a trust investment. (*Uzyel* at pp. 922–923.) This statute provides: "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the trust estate resulting from

22

the breach of trust, with interest." The court affirmed an award of prejudgment interest at the rate of 10 percent per annum pursuant to Probate Code section 16441, subdivision (a), which provides that a trustee owing interest under Probate Code section 16440 is liable for the greater of: "(1) The amount of interest that accrues at the legal rate on judgments in effect during the period when the interest accrued," and "(2) The amount of interest actually received." The legal rate of interest on judgments is 10 percent. (Code Civ. Proc., § 685.010, subd. (a).) The interest begins to accrue "on the date of the loss or depreciation in value." (*Uzyel, supra,* 188 Cal.App.4th at p. 923, fn. 42.)

The *Uzyel* decision and the statutes on which it relied apply here. To the extent Margaret took unauthorized distributions from the Decedent's Trust she, committed a breach of trust that caused a "loss or depreciation in value of the trust estate," and she is liable for the amount of the losses plus 10 percent annual interest from the dates they occurred. (*Uzyel, supra,* 188 Cal.App.4th at pp. 922–923; Prob. Code, § 16440, subd. (a)(1), § 16441, subd. (a)(1).) Margaret argues for a different result based on *In re Estate of Kampen* (2011) 201 Cal.App.4th 971 (*Kampen*), but *Kampen* is distinguishable.

In *Kampen*, the executor of two estates negligently delayed distributing the estates' assets to a beneficiary. The beneficiary sought prejudgment interest on all of the estates' assets under Probate Code section 9601, subdivision (a)(1), which parallels Probate Code section 16440 as follows: "(a) If a personal representative breaches a fiduciary duty, the personal representative is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in the value of the decedent's estate resulting from the breach of duty, with interest." The court held that the executor's liability under this statute was limited to executor-bond premiums that would not have been owed had the distributions been timely. (*Kampen, supra,* 201 Cal.App.4th at p. 989.) However, the court found no liability for "loss or depreciation" in the value of the rest of the estates because "the undisputed evidence established that [the executor] did not profit from the delay. There was no evidence that the estate[s] lost any profit as a result of [the executor's] breach. . . . An executor is similar to a trustee in many respects but, unlike a strict trustee, an executor has no statutory duty to invest money belonging to

23

the estate." Unlike the executor in *Kampen* who took nothing from the estates, Margaret appropriated some trust assets for herself without permission of the independent trustee, and wrongly caused "loss or depreciation" of the Decedent's Trust to the extent she depleted it without authorization. *Kampen* is thus consistent with *Uzyel*, and with the award of prejudgment interest here.

Margaret contends that prejudgment interest was proper in *Uzyel* but not in *Kampen* because the beneficiaries in *Uzyel* were not "contingent remaindermen" like those in *Kampen*, but rather "vested beneficiaries seeking to redress a breach of trust the proceeds of which they were immediately entitled to." Margaret notes that DeJohn is not entitled to any distribution from the Decedent's Trust unless and until DeJohn survives her. Margaret's argument and observation are misplaced because they erroneously assume that DeJohn, and not the Decedent's Trust, will receive the prejudgment interest.

Margaret points out that awards of prejudgment interest pursuant to Probate Code sections 16440, subdivision (a) and 16441, subdivision (a) are not mandatory, because subdivision (b) of both statutes states that "[if] the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so." The court will need to reconsider Margaret's reasonableness and good faith in light of her considerable success in the appeal.

(5) *Attorney Fees in This Case*

Margaret contends that the court erred when it held her liable for DeJohn's attorney fees in this case. The court's proposed statement of decision discussed the issue, and determined that attorney fees were recoverable under Probate Code section 17211. DeJohn's objections to the proposed statement of decision requested an additional finding that attorney fees were recoverable under the common fund doctrine. DeJohn moved for attorney fees, and the court filed its statement of decision before briefing on the motion was completed. The statement of decision did not discuss any rationale for fees, and simply stated that the Decedent Trust's recovery would be "in addition" to attorney fees. The court then granted the fee motion, and entered judgment holding Margaret liable to

24

DeJohn for attorney fees of $362,340.42 in this case pursuant to Probate Code section 17211. None of the briefing on the fee motion is included in the appellate record.

Probate Code section 17211, subdivision (b) provides: "If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred to contest the account. The amount awarded shall be a charge against the compensation or other interest of the trustee in the trust. The trustee shall be personally liable and on the bond, if any, for any amount that remains unsatisfied."

Margaret contends that she cannot be held liable to DeJohn for attorney fees under this statute because the statute is limited to contested accountings and DeJohn, as a remainder beneficiary, is not entitled to any accounting. Probate Code section 16062, subdivision (a) provides, subject to inapplicable exceptions, that "the trustee shall account at least annually, at the termination of the trust, and upon a change of trustee, to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed." Because this statute refers only to income beneficiaries, a trustee "does not have a statutory duty to account to remainder beneficiaries." (*Esslinger v. Cummins* (2006) 144 Cal.App.4th 517, 528; but see Prob. Code, § 16061 [subject to inapplicable exceptions, "on reasonable request by a beneficiary, the trustee shall report to the beneficiary by providing requested information to the beneficiary relating to the administration of the trust relevant to the beneficiary's interest"].

Whether DeJohn has a statutory right to annual accountings is irrelevant to Margaret's liability for attorney fees in this case. DeJohn asked Margaret for an accounting, and Margaret provided two of them in Colorado. DeJohn's California petition alleged that Margaret's accountings were incomplete, and disclosed multiple breaches of duty on her part, including most notably unauthorized and improper distributions. This case was in essence a contest to a trustee's account, and Probate Code section 17211, subdivision (b) is squarely applicable. (*Leader v. Cords* (2010) 182

25

Cal.App.4th 1588, 1599 ["[a] beneficiary may, of course, contest a trustee's account on the basis of a distribution made from the trust"].)

Margaret cites *Soria v. Soria* (2010) 185 Cal.App.4th 780 (*Soria*), for the proposition that fees are recoverable under this statute only insofar as they were incurred in connection with DeJohn's request for an accounting, not her demand that Margaret be surcharged. *Soria* was a dispute among family members concerning an agreement that was determined to be a trust. The suit was prosecuted as a civil action rather than a special proceeding in probate. The family members found to be trustees presented an account, which served as the basis for calculating the amount the trustees owed the family members found to be beneficiaries. The beneficiaries "did not contest a trustee's accounting" (*id.* at p. 786), and even "if [they] did anything at trial that could be construed as a contest to the account, the contest was unsuccessful" (*id.* at p. 787). *Soria* is thus entirely inapposite. The *Soria* court was concerned that a Probate Code section 17211, subdivision (b) fee award in that case would turn the statute into a "basis for recovery of attorney fees in virtually any case in which the existence of a trust is in dispute or any action of a trustee is challenged." (*Id.* at p. 789.) No such risk is created by a fee award under Probate Code section 17211 in this case.

While we agree with DeJohn that she is eligible for an award of attorney fees under the statute, her entitlement to those fees must be reexamined in light of Margaret's considerable success. DeJohn won an unqualified victory in the trial court, but Margaret has prevailed on several issues. In view of that result, the trial court must reconsider whether Margaret's opposition to DeJohn's petition was "without reasonable cause and in bad faith" within the meaning of the statute. (See *Uzyel*, *supra*, 188 Cal.App.4th at pp. 926–928 [reversing a Prob. Code, § 17211, subd. (b) fee award even though the trustee was found liable for millions of dollars of compensatory and punitive damages].)

We reject DeJohn's argument that she is entitled to attorney fees under the common fund doctrine. "The common fund doctrine is based on the principle that 'where a common fund exists to which a number of persons are entitled and *in their interest* successful litigation is maintained for its preservation and protection, an allowance of

26

counsel fees may properly be made from such fund.' [Citation.] The purpose of the doctrine is to allow a party, who has paid for counsel to prosecute a lawsuit that creates a fund *from which others will benefit*, to require those other beneficiaries to bear their fair share of the litigation costs. [Citation.]" (*Northwest Energetic Services, LLC v. California Franchise Tax Board* (2008) 159 Cal.App.4th 841, 878 [italics added].)

DeJohn cannot be deemed to have prosecuted this case in the interest or for the benefit of Margaret or Stephen when the common fund she created, a judgment increasing the value of the Decedent's Trust, was done at their expense. In common fund cases "the applicant for attorney fees and the parties from whom fees [are] sought [are] similarly situated with mutual interests in and mutual rights to proceed and recover the sums representing the fund which they shared." (*Lindsay v. County of Los Angeles* (1980) 109 Cal.App.3d 933, 938.) DeJohn on the one hand and Margaret and Stephen on the other were adversaries in the case, not "similarly situated with mutual interests" in the outcome. As Margaret puts it, to apply the common fund doctrine here "would turn[] the concept of a 'common fund' on its head."

B. <u>Wheeler's Liability to the Decedent's Trust</u>

Wheeler contends that he did not breach his "[l]imited [d]uties as the [i]ndependent [t]rustee." He argues that he committed no breach because under the terms of the Decedent's Trust, "he had 'sole discretion,' not an obligation, to approve payments" to Margaret. The California Society of Certified Public Accountants (CSCPA) makes this same argument in an amicus curiae brief in support of Wheeler's appeal, and contends that Wheeler had no duty to act unless and until Margaret requested a distribution.

With respect to income distributions, CSCPA submits that "the only way for the Independent Trustee to exercise his duty concerning the distribution of income would be for the Trustee to present the Independent Trustee with a request to approve the distribution of income. Until the Trustee makes the request, the Independent Trustee has no duty or power to act." With respect to principal, CSCBA notes that the trust provides for payments by Wheeler to Margaret, but gives Margaret " 'full rights, powers and

27

dominion over [trust] property, the same as an owner thereof,' " which CSCPA construes as a directive that trust assets "must be held by the Trustee." Given this apparent contradiction, CSCPA reasons that "the only logical interpretation of [the payment] provision would be for the Trustee to request a principal distribution and for the Independent Trustee to exercise his discretion to 'pay' the principal to the surviving trustor. As with the income distributions, however, the Trustee, Margaret Narron, never made any request for a principal distribution to the Independent Trustee, Wheeler. Thus, he was never called upon to exercise his discretion to approve or not to approve any such request."

CSCPA observes the court stated in *Crocker-Citizens National Bank v. Younger* (1971) 4 Cal.3d 202, 211 (*Crocker-Citizens*) that "in general, trustees are bound by the terms of the trust and possess only that authority conferred upon them by the trust. [Citations.] . . . 'Insofar as the trust instrument expressly or by implication imposes duties or confers powers upon the trustee, the terms of the trust determine the extent of his duties and powers . . . .' Wheeler cites *Ringrose v. Gleadall* (1911) 17 Cal.App. 664 (*Ringrose*), to the same effect. In *Ringrose*, the court stated that a trustee had performed his two duties under the terms of the trust, and asked, "Was there anything else for him to do in order to discharge his trust? It would be impossible to so hold without reading into the declaration of trust something not found therein. . . . [W]e have nothing to do but to give effect to the language has we find it." (*Id.* at p. 668.) CSCPA has also marshaled out-of-state cases for the principle that the powers and duties of special trustees and advisors are limited "to those provided by the trust instrument."

The trial court found that Wheeler breached his duties as independent trustee by giving Margaret "free rein to take as much money from the Decedent's Trust as she desired." In the trial court's view, this dereliction constituted a breach of Wheeler's duty of loyalty to the remainder beneficiaries (Prob. Code, § 16002), his duty to reasonably exercise his discretionary power as independent trustee (Prob. Code, § 16080), and his duty to exercise reasonable care in that capacity (Prob. Code, § 16040). The trial court further determined that Wheeler breached a duty to enforce claims of the Decedent's

28

Trust (Prob. Code, § 16010) by failing to demand that Margaret return the money she took from it.

All of these findings were in error because the Decedent's Trust did not direct Wheeler to control Margaret's access to trust assets or require him to enforce trust claims. The trust gave Margaret, not Wheeler, "full rights, powers and dominion over the [trust] property, the same as an owner thereof," and expressly limited Wheeler's duties to discretionary approvals of distributions of principal and income to her. He had no duties beyond those specified in the trust agreement. (*Crocker-Citizen's, supra,* 4 Cal.3d at p. 212; *Ringrose, supra,* 17 Cal.App. at p. 668.)

Our conclusion is supported by comments on section 81 of the Restatement Third of Trusts, which concern the duties of co-trustees. This section states: "(1) If a trust has more than one trustee, except as otherwise provided by the terms of the trust, each trustee has a duty and the right to participate in the administration of the trust. [¶] (2) Each trustee also has a duty to use reasonable care to prevent a co-trustee from committing a breach of trust and, if a breach of trust occurs, to obtain redress." (*Ibid.*) However, comment b to this section, addressing the "[e]*ffect of the terms of the trust*," notes that '[t]he duties of multiple trustees as discussed in this Section may be reduced, modified or specially allocated by the terms of the trust." The comment then explains, as directly relevant here:

"Thus, trust provisions may and often should allocate roles and responsibilities among the trustees, or relieve one or more of the trustees of duties to participate in particular aspects of the trust's administration. A settlor may even designate, or provide for the appointment of, a 'special trustee' to handle only one or more specified functions or types of decisions (e.g., the exercise of tax-sensitive powers of distribution, when the general trustee or trustees are beneficiaries of those powers), with the special trustee having no authority in or responsibility for other aspects of the trust's administration. The settlor's limiting of a trustee's functions or allocation of functions among the trustees usually, either explicitly or as a matter of interpretation, has the effect of relieving the trustee(s) to whom a function is not allocated of any affirmative duty to remain informed

29

or to participate in deliberations about matters within that function." (Rest.3d Trusts, § 81, com. b, p. 171.) Under the terms of the Decedent's Trust, the independent trustee's only function is approval of distributions to the surviving spouse, and he or she has "no authority in or responsibility for other aspects of the trust's administration." (*Ibid.*)

Our conclusion is further supported by comments on section 75 of the Restatement Third of Trusts, which address the power to control the acts of a trustee. The section states: "[I]f the terms of a trust reserve to the settlor or confer upon another a power to direct or otherwise control certain conduct of the trustee, the trustee has a duty to act in accordance with the requirements of the trust provision reserving or conferring the power and to comply with any exercise of that power . . . ." (Rest.3d Trusts, § 75, p. 50.) A comment to this section explains: "The duties of a trustee under a trust provision of this type include a duty to provide the designated person with such information and opportunity to respond as may be expressly or impliedly called for by the terms of the provision. . . . [¶] Where certain actions the trustee may wish to take are not to be taken without the consent, direction, or authorization of a designated person . . . it is implicit in the nature of the provision that the trustee must inform that person of any desired actions and allow a reasonable opportunity to respond." (Rest.3d Trusts, § 75, com. b(1), p. 52.) Under this authority, Margaret was required to seek Wheeler's approval for distributions, and he had no obligation to act if she did not initiate any such requests.

Accordingly, we conclude that Wheeler breached no duty under the Decedent's Trust, and is not liable for Margaret's unauthorized distributions.

## C. APC's and LLP's Liability to the Trust

The judgment holds APC and LLP vicariously liable for Wheeler's alleged breaches of duty to the Decedent's Trust. Since there were no such breaches on Wheeler's part, APC and LLP have no liability.

## D. Margaret's and Wheeler's Liability to DeJohn Personally

The court held Margaret and Wheeler jointly and severally liable to DeJohn for $45,967.53 in attorney fees she incurred in the Colorado action because they filed false affidavits in that case that caused her to dismiss it and re-file it in California. Margaret

30

falsely claimed that her primary residence at the time was in California, and Wheeler falsely claimed that "[h]is day-to-day activities as the Independent Trustee of the Decedent's Trust, such as reviewing requests for distributions from the trust," were conducted in California.

Margaret does not dispute the falsity of her 2009 affidavit. The affidavit stated that she maintained her primary residence in California, but she testified that she moved into a residence in Colorado in 2008. However, Wheeler contends, and we agree, that his affidavit was not false. The court found that he approved distributions to Margaret—his only activity, "day-to-day" or otherwise, as independent trustee—after the sale of the Sunnyvale property in 2000. Wheeler testified that, when he signed the affidavit, he was preparing tax returns for Margaret and assisting with potential settlement of the Colorado action. He said that he furnished information for the accountings Margaret filed in that case. Whereas the evidence showed that Margaret engaged in trust-related activity in Colorado, no evidence suggested that Wheeler approved the Sunnyvale distributions or took any other action involving the Decedent's Trust while he was outside California.

Margaret contends that her false affidavit did not damage DeJohn because DeJohn incurred her Colorado legal fees before the affidavits were filed. But the affidavit led to DeJohn's dismissal of the Colorado case, and the potential loss of the benefit of those fees.

Margaret argues that "awarding attorneys fees as tort 'damages' to a beneficiary is impermissible in the trust law context." Her argument is predicated on Probate Code section 16440, which provides: "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. [¶] (2) Any profit made by the trustee through the breach of trust, with interest. [¶] (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust." However, attorney fees were awardable under Probate Code section 17211, subdivision (b) for unreasonable and bad faith defense of the Colorado action.

31

Margaret contends that "a California court lacks jurisdiction to award fees for work before a Colorado Court. Such an award would also violate the sovereignty of Colorado's courts." We do not address these arguments because they are raised improperly for the first time in Margaret's reply brief. (*Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1372, fn. 11, disapproved on another point in *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 382–388.)

## III. DISPOSITION

The judgment is reversed insofar as it denies Margaret credit for the income distributions Wheeler approved at trial and the principal distributions he approved in 2000 after the sale of the Sunnyvale property. The superior court is directed to determine the amount to be credited to Margaret for those distributions, to reassess Margaret's reasonableness and good faith in deciding whether the Decedent's Trust is entitled to prejudgment interest, and, if prejudgment interest is awarded, to recalculate the amount in light of the reduced amount she owes the trust. The judgment is reversed insofar as it holds Margaret liable for DeJohn's attorney fees in this case, and the court is directed to reassess Margaret's fee liability in light of our decision in this appeal. The judgment is reversed insofar as it makes Margaret jointly and severally liable with Stephen for the loans he received from the Decedent's Trust. The judgment is reversed insofar as it holds Wheeler, APC, and LLP liable. The judgment is affirmed insofar as it holds Margaret liable to DeJohn personally for fees incurred in the Colorado. The case is remanded for further proceedings consistent with this opinion. The parties will bear their own costs on appeal.

_____
Siggins, J.

We concur:


_____
Pollak, Acting P.J.


_____
Jenkins, J.